**STATE OF HAWAII,** Plaintiff–Appellee, v. **LOUIS AGRABANTE,** Defendant–Appellant

NO. 15048

(CR. NO. 90–0576)

MAY 13, 1992

LUM, C.J., PADGETT, HAYASHI, WAKATSUKI, AND MOON, JJ.*

---

*Associate Justices Padgett and Hayashi, who heard oral argument, retired from the court on March 29, 1992. *See* HRS § 602–10 (1985).

180

OPINION OF THE COURT BY MOON, J.

Defendant–appellant Louis Agrabante (defendant) appeals from his conviction for promoting a dangerous drug in the first

degree, a violation of Hawaii Revised Statutes (HRS) § 712–1241(1)(a)(i) (1985). Defendant was arrested and charged after he purchased cocaine from an undercover police officer in a "reverse buy" operation. On appeal, defendant contends that (1) the trial court erred in failing to dismiss the charge against him based on alleged outrageous police conduct that violated his due process rights; (2) the reverse buy was entrapment per se; (3) the court erred in refusing to instruct the jury on the defense of entrapment; (4) the court erred in refusing to redact portions of a tape–recorded telephone conversation and a videotape which allegedly referred to defendant's predisposition and propensity to purchase drugs; and (5) he was deprived of a fair trial because of the prosecutor's misconduct in referring to matters regarding undercover investigations and drug dealing.

Based on the reasons that follow, we affirm defendant's conviction.

I.

Defendant was arrested on March 6, 1990 after purchasing approximately one ounce of cocaine from undercover narcotics officer James Wardle (Wardle). The drug transaction was arranged by defendant's friend, Kamaile Shoaf (Shoaf). Defendant had no contact with Wardle prior to the transaction.

The events leading up to defendant's arrest began on February 21, 1990, when Wardle went to the Shindig Bar in downtown Honolulu, posing as a major drug trafficker. In an effort to reach the larger or mid–level drug dealers, Wardle had been instructed to make it known that he was selling large amounts of cocaine, and to sell no less than an ounce of the drug at a time.

At the bar, Wardle was introduced to Shoaf by Gerald Arthur (Arthur), a person with whom Wardle had conducted drug transactions on prior occasions. Arthur asked Shoaf to obtain some heroin for Wardle, and Shoaf agreed, provided that Wardle drive her to

where she could get it. Wardle drove Shoaf to the location where she purchased three "papers" [1] of heroin at $40 each, one of which was for herself. Wardle paid Shoaf $80 for the other two papers. On the way back to the bar, Shoaf wanted to inject the heroin. She became irritable and upset when Wardle indicated that he preferred she not do so. However, because Wardle did not want to "blow [his] cover," he ultimately drove Shoaf to a place where she could shoot the heroin. At trial, Wardle testified that arresting Shoaf was not part of his instructions, but that he could make an arrest if "extremely necessary" to protect himself and others. As they were driving back, Wardle told Shoaf he would sell cocaine to her friends at $1,000 to $1,500 an ounce and give her either money or cocaine in return. Shoaf indicated she wanted cocaine.

On March 4, 1990, Wardle again drove Shoaf to a location where she could purchase heroin. Wardle gave her money to buy two papers for him and also lent Shoaf money, which she used to buy a paper of heroin for herself. Shoaf once again wanted to inject the heroin while in Wardle's truck. Shoaf was pale, sweaty, and became frustrated when she could not find a vein, so Wardle stopped the truck. At Shoaf's request, Wardle handed her his belt to use as a tourniquet. Shoaf also asked Wardle to pull on the belt, which he did. However, it is unclear whether Shoaf injected herself while Wardle assisted with the tourniquet because Wardle testified at trial that Shoaf returned the belt to him before she injected herself.

On March 5, 1990, Shoaf telephoned Wardle and advised that she had a buyer (defendant). That conversation was tape-recorded. The next day, March 6, 1990, Shoaf and defendant met Wardle at the location Wardle had specified. Defendant was to have purchased an ounce of cocaine for $1,000 but had only $690

---

[1] According to Wardle, a "paper" "[r]efers to a small single dose amount . . . one hit of a drug."

at the time. After some discussion, Wardle agreed that defendant could pay the balance the next day. Wardle then collected the $690 and handed the cocaine to defendant. After giving the prearranged signal to the undercover surveillance team who had been videotaping the transaction, police moved in for the arrest. In order not to reveal his identity as a police officer, Wardle was arrested along with Shoaf and defendant.

Prior to trial, defendant moved to exclude, among other things, any testimonial or documentary evidence that would show his propensity or predisposition to commit the offense charged. Specifically, defendant sought to exclude the March 5, 1990 tape–recorded telephone conversation between Shoaf and Wardle, and the videotape of the March 6, 1990 drug transaction. Further, defendant argued that he should have the benefit of the defense of entrapment because Shoaf was an unwitting person who induced defendant to make a drug transaction with an undercover police officer. The trial court disagreed, finding that an entrapment defense was not applicable.

When the recorded telephone conversation and the videotape were offered into evidence, defendant objected, arguing that the taped conversation contained language which pointed to defendant's predisposition to commit the crime charged, and therefore should be redacted. For example, statements such as "[y]ou got somebody who want some?," "he's been waiting since two o'clock," and he's been "waiting and waiting." Defendant also submitted that the videotape contained similar language, such as "[he] had the money yesterday," and thus should also be redacted. However, the court overruled defendant's objections and allowed the tapes to be played, unredacted, for the jury.

The defendant also requested that the court instruct the jury on the defense of entrapment. However, the trial court refused to give any entrapment instructions on the ground that the evidence did not show inducement by the police or a police agent.

The jury found defendant guilty as charged. Defendant's timely appealed followed.

## II.
## A. Due Process Violation

Defendant failed to move to dismiss the charge against him at trial, but contends on appeal that the trial court committed plain error when it failed to dismiss on the ground that the police conduct in this case was so outrageous that due process principles barred his conviction. "Generally, appellate courts will not consider questions which were not raised in the trial courts." *State v. Kahalewai*, 56 Haw. 481, 491, 541 P.2d 1020, 1027 (1975) (citation omitted). However, "where plain errors were committed and substantial rights were affected thereby, the errors 'may be noticed although they were not brought to the attention of the [trial] court.' " *State v. Fox*, 70 Haw. 46, 55, 760 P.2d 670, 675 (1988) (citing Hawaii Rule of Penal Procedure (HRPP) 52(b)).

Defendant argues that the outrageous police conduct, which violated his right to due process, consisted of 1) befriending Shoaf, a heroin addict, and providing her transportation, money, and otherwise assisting in the maintenance of her addiction, and 2) the reverse buy operation itself, where the police supplied the cocaine and sold it to the defendant.

In considering the defense of entrapment, the United States Supreme Court accepted the proposition that the defense of due process based on outrageous conduct may be available under certain extreme circumstances. In *United States v. Russell*, 411 U.S. 423 (1973), the Court stated, "[w]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction[.]" *Id.* at 431–32.

It is clear from **Russell** and cases which have followed, that the entrapment defense, which is premised on statutory requirements, and the constitutionally based due process defense are separate and distinct defenses.

> [A] successful due process defense must be predicated on intolerable government conduct which goes beyond that necessary to sustain an entrapment defense. The genesis of the entrapment defense lay in the Court's interpretation of legislative intent; "[s]ince the defense is not of a constitutional dimension, Congress may address itself to the question and adopt any substantive definition of the defense that it may find desirable." **United States v. Russell**, 411 U.S. at 433, 93 S. Ct. at 1643 (footnote omitted). We must necessarily exercise scrupulous restraint before we denounce law enforcement conduct as constitutionally unacceptable; the ramifications are wider and more permanent than when only a statutory defense is implicated.

**United States v. Jannotti**, 673 F.2d 578, 607 (3rd Cir.), **cert. denied**, 457 U.S. 1106 (1982). Thus, the controlling standard of each defense differs. Where the federal courts continue to adhere to the "subjective test" for the entrapment defense, which "focus[es] on the intent or predisposition of the defendant to commit the crime . . . rather than upon the conduct of the Government's agents[,]" [2] **Hampton v. United States**, 425 U.S. 484, 488 (1976) (citation omitted), the "objective test," which focuses solely on the government's conduct, is applicable when the due process defense is raised. **Jannotti**, 673 F.2d at 610.

---

[2] In Hawaii, unlike the federal courts, we have adopted the objective test when considering the entrapment defense, which we discuss under section B of this opinion.

This court in *State v. Tookes*, 67 Haw. 608, 699 P.2d 983 (1985), also acknowledged that police tactics in detecting crimes may present the possibility of a defense based on the due process clauses of the fifth amendment to the United States Constitution and article I, § 5 of the Hawaii Constitution. The outrageous police conduct alleged in *Tookes* involved a civilian agent who, under direction of the police, engaged in sexual intercourse to obtain evidence for a prostitution conviction. Although we questioned whether such conduct comported with the "ethical standards which law enforcement officials should be guided by," we held that the conduct of the police and its agent did not constitute "outrageous conduct in the constitutional sense." *Id.* at 613, 699 P.2d at 987. We specifically determined that "[d]ue process principles bar the government from invoking judicial process to obtain a conviction when police conduct violates fundamental fairness or shocks the conscience." *Id.* at 609, 699 P.2d at 984. We further explained that "the due process 'defense' involved a balancing of policy considerations in favor of crime detection and punishment against the policy of fair treatment." *Id.* at 612, 699 P.2d at 986 (citation omitted). Since "there was no showing that [the civilian agent's] actions increased the criminality which was already occurring," we determined that the use of the agent by the police was necessary "to gain acceptance by participants in a criminal act." *Id.* at 612, 699 P.2d at 986–87.

"Courts must look to the nature of the crime and the means available to law enforcement officials to combat it in deciding whether police conduct violates due process." *Harrison v. State*, 442 A.2d 1377, 1387 (Del. 1982). In order to ferret out illicit drug traffickers, the police in the instant case had officer Wardle pose as a drug dealer and infiltrate local bars by affiliating with and gaining the confidence of drug violators like Shoaf. Such tactics have been recognized as an effective method of detecting drug-related offenses. In *Russell*, the United States Supreme Court

stated that the infiltration of drug rings and the limited participation in their unlawful practices

> is a recognized and permissible means of investigation; if that be so, then the supply of some item of value that the drug ring requires must, as a general rule, also be permissible. For an agent will not be taken into the confidence of the illegal entrepreneurs unless he has something of value to offer them. Law enforcement tactics such as this can hardly be said to violate "fundamental fairness" or "shocking to the universal sense of justice."

411 U.S. at 432 (citation omitted).

It is well established that a due process violation for outrageous conduct will be found only in "the rarest and most outrageous of circumstances." *United States v. Knight*, 917 F.2d 1, 2 (5th Cir.), *cert. denied*, ___ U.S. ___, 111 S. Ct. 533, 112 L. Ed. 2d 543 (1990). While the actions of officer Wardle may be questionable from an ethical standpoint, we cannot say that his limited participation in Shoaf's illegal activities was so outrageous as to "shock[] the conscience." In our view, Wardle's actions were necessary to gain Shoaf's confidence and to maintain his assumed identity so as not to jeopardize the ongoing undercover investigation. Such actions did not rise to the level of misconduct sufficient to support a due process violation.

We also conclude that the police conduct of supplying and selling the cocaine, which has been referred to herein as a "reverse buy," and by other courts as a "reverse sting" operation, was not so outrageous as to deprive him of his right to due process. In *Russell*, the undercover agent supplied the defendant with an essential chemical which was difficult to obtain but legally available in order to manufacture methamphetamine in return for half the drug produced. Defendant was found guilty of having unlawfully manufactured and processed methamphetamine. The court of appeals reversed, holding that the agent's conduct in supplying

the chemical was "an intolerable degree of governmental participation in the criminal enterprise." *Russell*, 411 U.S. at 424. In reversing the court of appeals, the Supreme Court deemed it permissible for law enforcement to have supplied the "item of value that the drug ring require[d]," the chemical, as part of their investigation of illicit drug trafficking. *Id.* at 432.

> The fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat prosecution. Nor will the mere fact of deceit defeat a prosecution for there are circumstances when the use of deceit is the only practicable law enforcement technique available.

*Id.* at 435–36 (citations omitted).

Since the *Russell* decision, there has been general acceptance of reverse buy or reverse sting operations, but unlike the present case, we note that the government in *Russell* did not go so far as to supply the contraband which formed the basis of defendant's conviction. However, the Supreme Court was confronted with the government supplying the actual contraband in the course of an investigation involving illicit drug activities in *Hampton v. United States*, 425 U.S. 484 (1976). The Court upheld the defendant's conviction for the sale of heroin, which he procured from a government informant or agent. Justice Powell in his concurring opinion in *Hampton* commented upon the availability of the due process defense in reverse sting operations.

> Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction. This would be especially difficult to show with respect to contraband offenses, which are so difficult to detect in the absence of undercover Government involvement. One cannot easily exaggerate the problems confronted by law enforcement authorities in dealing effectively with an expanding narcotics traffic, cf. *United*

> *States v. Russell, supra*, at 432; L. Tiffany, D. McIntyre,
> & D. Rotenberg, Detection of Crime 263–264 (1967),
> which is one of the major contributing causes of escalat-
> ing crime in our cities. See President's Commission on
> Law Enforcement and Administration of Justice, The
> Challenge of Crime in a Free Society 221–222 (1967).
> Enforcement officials therefore must be allowed flexibil-
> ity adequate to counter effectively such criminal activity.

*Id.* at 495–96 n.7 (Powell, J., concurring).

In *Harrison v. State*, 442 A.2d 1377 (Del. 1982), government agents furnished marijuana to the defendant, a prison guard, and paid her $100 to sell the contraband to an inmate who was cooper- ating with the government. As in the instant case, the defendant in *Harrison* argued that such conduct by law enforcement was so out- rageous and overreaching as to violate her right to due process. The Delaware Supreme Court recognized the special problems of proof, detection, and danger for law enforcement personnel in the investigation of illicit drug trafficking and acknowledged that the police tactic was necessary to combat such crimes. It reasoned that "[t]o hold that the conduct of the State Police in this matter was overreaching and injurious to defendant's due process right would be to deprive our law enforcement officers of an effective tool for stamping out crime, and we decline to do so." *Id.* at 1387; *see also United States v. Nixon*, 777 F.2d 958 (5th Cir. 1985); *United States v. Lentz*, 624 F.2d 1280 (5th Cir. 1980), *cert denied*, 450 U.S. 995 (1981).

Defendant's reliance on three cases for the proposition that reverse buy operations are violative of his due process rights is misplaced. The government's involvement in all three cases far exceeded the police activity in the instant case. *United States v. Twigg*, 588 F.2d 373 (3rd Cir. 1978), involved the manufactur- ing of methamphetamine in an illegally operated laboratory. Unlike the *Russell* case where the government merely provided

an essential but legally obtainable chemical to manufacture methamphetamine, the government action in *Twigg* included: 1) supplying about twenty percent of the glassware and the indispensable ingredient phenyl–2–propanone; 2) arranging the purchase of other materials from chemical supply houses; 3) supplying the business name under which supplies were ordered and business conducted; 4) actually purchasing all of the supplies with the exception of a separatory funnel; and 5) providing an isolated farmhouse as a production site because defendants were unable to secure a site on their own. All of the aforementioned were provided at no cost to the defendants. Moreover, the under-cover agent provided all of the laboratory expertise because neither defendant knew how to actually manufacture methamphetamine. Whatever assistance defendants provided was minimal and only at the specific direction of the undercover agent.

In the second case, *Commonwealth v. Mathews*, 347 Pa. Super. 320, 500 A.2d 853 (1985), the Superior Court of Pennsylvania determined that the facts in *Mathews* were no less outrageous than in *Twigg*, and held that defendants were denied due process. The police in *Mathews* provided funds to purchase chemicals necessary to produce methamphetamine; obtained an embossed letterhead that referred to a fictitious research company so defendants could more easily purchase the required chemicals; provided defendant with funds to purchase food during the operation; provided a manual with a formula to manufacture the drug; and supplied a government chemist to instruct defendants on the steps through the formula.

Finally, in *State v. Glosson*, 462 So. 2d 1082 (Fla. 1985), the Supreme Court of Florida upheld the trial court's dismissal of possession of cannabis charges on the ground that the defendants' due process rights were violated. Although the Sheriff's Department provided the marijuana to its paid informant, which was in turn sold to the defendants, the focus of the government's

outrageous conduct was a contingency fee agreement between the sheriff and the informant. Under the agreement, which the State Attorney's Office knew about, the informant would receive ten percent of all civil forfeiture proceedings "resulting from all criminal investigations by him." *Id.* at 1083. Further, the agreement provided

> that the contingent fee would be paid out of civil forfeitures received by the sheriff; that [the informant] must testify and cooperate in criminal prosecutions resulting from his investigations in order to collect the contingent fee; that this [case was] one of those criminal prosecutions; and [the informant] must testify and cooperate in this case for there to be a successful prosecution.

*Id.* at 1083. The court stated,

> [w]e can imagine few situations with more potential for abuse of a defendant's due process right. The informant here had an enormous financial incentive not only to make criminal cases, but also to color his testimony or even commit perjury in pursuit of the contingent fee. The due process rights of all citizens require us to forbid criminal prosecutions based upon the testimony of vital state witnesses who have what amounts to a financial stake in criminal convictions.

*Id.* at 1085. Clearly, the government's involvement in the aforementioned cases violated "that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *Russell*, 411 U.S. at 432 (quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246 (1960)). However, that degree of government involvement is not present in the instant case.

Based on the foregoing discussion, we hold that the reverse buy operation in this case did not violate defendant's due process rights.

## B. Entrapment

Defendant also contends that the trial court committed plain error by failing to dismiss the charge on the ground that the reverse buy operation was "a scheme in which it was substantially certain that a crime would be committed" and thus constituted entrapment as a matter of law. Alternatively, defendant argues that even assuming the reverse buy was not entrapment per se, the trial court erred in refusing to instruct the jury on the defense of entrapment.

The question of whether a reverse buy constitutes entrapment as a matter of law is one of first impression in Hawaii. We address the question in light of Hawaii's entrapment statute, HRS § 702–237, which provides in pertinent part:

> (1)   In any prosecution, it is an affirmative defense that the defendant engaged in the prohibited conduct or caused the prohibited result because he was induced or encouraged to do so by a law enforcement officer, or by a person acting in cooperation with a law enforcement officer, who, for the purpose of obtaining evidence of the commission of an offense, either:
>
> . . . .
>
> (b)   Employed methods of persuasion or inducement which *created a substantial risk that the offense would be committed by persons other than those who are ready to commit it.*

HRS § 702–237 (1985) (emphasis added).

In enacting HRS § 702–237, the legislature adopted the approach of the Model Penal Code which endorsed the objective test of the entrapment defense. Under the objective test as we discussed in regard to the due process defense, "the focus of inquiry is not on the predisposition of the defendant to commit the crime charged, but rather is on the conduct of the law enforcement

officials." *State v. Anderson*, 58 Haw. 479, 483, 572 P.2d 159, 162 (1977). Thus, the dispositive question is whether the action of the police in conducting the reverse buy operation "was so extreme that it created a substantial risk that persons not ready to commit the offense alleged would be persuaded or induced to commit it." *Id.* at 484, 572 P.2d at 162; *accord State v. Nakamura*, 65 Haw. 74, 648 P.2d 183 (1982); HRS § 702–237 commentary.

Defendant argues that "the police themselves were the ones who provided and sold the cocaine," and but for those actions, Shoaf would not have contacted defendant "and the offense for which [defendant] was convicted would not have occurred." Defendant relies heavily upon *State v. Powell*, 68 Haw. 635, 726 P.2d 266 (1986), in support of his contention that the reverse buy operation constituted entrapment per se.[3]

In *Powell*, the police instituted a "drunk decoy" operation where a police officer, posing as a helpless drunkard, lay on the

---

[3] Defendant also cites *Kemp v. State*, 518 So. 2d 656 (Miss. 1988); *State v. Talbot*, 71 N.J. 160, 364 A.2d 9 (1976); *People v. Strong*, 21 Ill. 2d 320, 172 N.E.2d 765 (1961); *State v. McKinney*, 108 Ariz. 436, 501 P.2d 378 (1972), in support of his position that reverse buy or sting is entrapment per se. However, all of these cases except for *Kemp* involved government agents supplying contraband to a defendant who subsequently sells to another government agent. In a six to three decision in *Kemp*, no subsequent sale to a government agent occurred and yet the majority of the court found entrapment as a matter of law. The dissent pointedly referred to the majority's misapplication of Mississippi's precedents. The dissent stated:

> Obviously, the Court quoted the passage [in *Barnes v. State*, 493 So. 2d 313 (Miss. 1986) (quoting *Tribbett v. State*, 394 So. 2d 878, 882 (Miss. 1981))] for its reference to an informant or undercover agent, who supplies an accused with contraband. Yet, this alone is not determinative of entrapment. Entrapment occurred in the cases cited above only when the informant or undercover agent instigated the sale *and subsequent purchase*. These are not the facts here. In this case, the [undercover] agent, who asked [the co–defendant] if he knew anyone who would be interested in the purchase of marijuana, merely provided him with an opportunity to violate the law — a valid law enforcement technique often found in "sting" operations.

*Kemp*, 518 So. 2d at 659 (emphasis in original).

ground with a wallet protruding out of his back pocket, partially exposing currency to persons walking by. Several other officers positioned themselves nearby to observe. This operation netted nineteen persons, including the defendant, for "rolling drunks." Finding that such operation constituted entrapment as a matter of law, the circuit court dismissed the charge against the defendant. On appeal, this court stated, "[w]e would be hard put to contradict the court's further finding that the 'drunk decoy' operations were expressly designed to ensnare anyone who would commit theft when 'bait money' is placed in plain view and within easy reach." *Id.* at 638, 726 P.2d at 268. Under such circumstances, we agreed with the trial court that the drunk decoy operation "created a substantial risk that [theft] would be committed by persons other than those who [were] ready to commit it." *Id.* at 639, 726 P.2d at 268 (quoting HRS § 702–237(1)(b)).

The facts and circumstances of the instant case are clearly distinguishable from *Powell* where the police, in the latter case, essentially manufactured rather than detected the crime. In this case, there is no evidence that the reverse buy operation exhibited or displayed cocaine for sale to the general public or in any manner persuaded or induced persons other than those who were actively seeking to purchase such illegal drugs. Not only is the record devoid of any evidence that defendant was persuaded or induced by the police to purchase the cocaine; defendant did not have any contact with Wardle prior to March 6, 1990, the date of the drug transaction. Although the drug transaction was arranged by Shoaf, who apparently had come to trust Wardle, Shoaf's participation was not of "a person acting in cooperation with a law enforcement officer[.]" HRS § 702–237(1). Shoaf, who was charged with three counts of promoting a dangerous drug as a result of Wardle's direct contacts with her, acted as a principal lawbreaker and not as an agent of law enforcement. In this case, the police merely provided defendant an opportunity, as opposed to an inducement, to commit

the charged offense. *See Sorrells v. United States,* 287 U.S. 435, 441 (1932) (citations omitted).

Conceding that Shoaf was not "a person acting in cooperation with a law enforcement officer," HRS § 702–237, defendant urges this court to adopt the law of derivative entrapment, also known as vicarious entrapment, where a defendant is induced by a non–governmental or private party to commit an offense. We instead adopt the view, which defendant recognizes as the majority rule, "that the entrapment defense does not extend to inducement by a private citizen." *United States v. Leroux,* 738 F.2d 943, 947 (8th Cir. 1984) (citations omitted). *See, e.g., United States v. Emmert,* 829 F.2d 805 (9th Cir. 1987) (holding entrapment defense available only where defendant has been directly induced by government agents; derivative entrapment established only where co–defendant who had contact with undercover officer, was an agent of the government at the time of the alleged inducement); *United States v. Stewart,* 770 F.2d 825 (9th Cir. 1985), *cert. denied,* 474 U.S. 1103 (1986) (upholding district court's refusal to give entrapment instruction where defendant never had contact with federal agent).

Insight into the legislative intent regarding the issue of derivative entrapment is provided by the comment to the Model Penal Code, which states, "[d]efendants who are aided, solicited, deceived or persuaded by police officials stand in the same moral position as those who are aided, solicited, deceived or persuaded by other persons; yet no one suggests a general defense for the latter." MODEL PENAL CODE § 2.13 comment, at 406 (1985) (footnote omitted). The footnote to the comment further indicates that the drafters rejected the derivative entrapment defense by stating that it is well settled "that the doctrine of entrapment does not extend to acts of inducement on the part of a private citizen who is not an officer of the law." *Id.* comment n.1, at 406 (citations omitted).

We recognize that the rationale of the derivative entrapment doctrine is to prevent the police from instigating crime via an unknown intermediary. However, we find that such purpose is outweighed by the cost to society that would result if defendants were allowed to claim entrapment "from the original improper use of governmental power by the State agent, regardless of whether each defendant was ever induced by the government to commit the crime in the first place." *Norman v. State*, 588 S.W.2d 340, 346 (Tex. Crim. App. 1979), *cert. denied*, 446 U.S. 909 (1980).

Absent evidence of inducement by the police, we conclude that the reverse buy operation in this case did not constitute entrapment as a matter of law.

Alternatively, defendant argues that even assuming the reverse buy was not entrapment per se, the trial court erred in refusing to instruct the jury on the defense of entrapment because such instruction was justified by the evidence. A defendant in a criminal case "is entitled to an instruction on every defense or theory of defense having *any* support in the evidence, provided such evidence would support the consideration of that issue by the jury, no matter how weak, inconclusive or unsatisfactory the evidence may be." *State v. O'Daniel*, 62 Haw. 518, 527–28, 616 P.2d 1383, 1390 (1980) (citations omitted; emphasis in original). However, in order to be entitled to an entrapment instruction, defendant must produce evidence of government inducement. As discussed above, we simply find no evidence to support a defense of entrapment. Thus, we hold that the trial court did not err in refusing to give defendant's requested entrapment instructions.

### C. Tape–recording and Videotape

Defendant contends that, assuming the evidence supported an entrapment defense, the unredacted tapes were inadmissible because the focus was on defendant's predisposition to commit the

crime and not on the police conduct. Having focused solely on the police conduct in this case, we concluded that the evidence failed to raise the issue of entrapment, thus we need not address this issue.

However, defendant also argues that the unredacted tape evinced "his readiness to purchase and the fact that he already had the money the day before." Defendant submits that such evidence was inadmissible because it pointed to his propensity to commit the crime charged, and thus constituted improper character evidence. Defendant attempts to characterize the portrayal of his readiness to purchase cocaine as a prior bad act, excludable under Hawaii Rules of Evidence (HRE) 404(b). Rule 404(b), HRE, provides:

> Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible where such evidence is probative of any other fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.

Defendant argues that the prohibited evidence "did not go towards identity because that was undisputed. Nor was it relevant to prove motive, opportunity, modus operandi or state of mind." Defendant further submits that even if the evidence was relevant, "its probative value is substantially outweighed by the danger of unfair prejudice[.]" HRE 403. Although we do not necessarily agree that the proffered evidence constituted a prior bad act, for purposes of this opinion, we accept defendant's contention that it does.

In this case, the prosecution was required to prove that defendant "knowingly" possessed one ounce or more of cocaine. HRS § 712–1241(1)(a)(i). Evidence that defendant had the money the day before the actual purchase, that he was using that money to

purchase the drug, and that he met Wardle at the pre–arranged location was probative of his "intent, preparation, plan, [and] knowledge." HRE 404(b). Under the balancing test of HRE 403, we conclude that the probative value of the evidence substantially outweighed any prejudice to defendant. *See State v. Castro*, 69 Haw 633, 756 P.2d 1033 (1988).

Therefore, we find no error by the trial court in refusing to redact the tapes as requested by defendant.

### D. Prosecutorial Misconduct

Finally, defendant asserts that "the prosecutor engaged in misconduct by repeatedly injecting into the trial matters relating to dealership quantities, search warrants, and undercover investigations, which tended to portray defendant as a dealer, instead of someone charged with possession." Prosecutorial misconduct may provide grounds for a new trial if the prosecutor's actions denied the defendant a fair trial. *State v. Pemberton*, 71 Haw. 466, 796 P.2d 80 (1990). In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, we consider the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant. *State v. Senteno*, 69 Haw. 363, 366, 742 P.2d 369, 372 (1987) (citing *State v. Marsh*, 68 Haw. 659, 661, 728 P.2d 1301, 1303 (1986)).

Defendant cites five instances of alleged prosecutorial misconduct: two instances occurred during the prosecutor's examination of Wardle, two other instances during the examination of Wardle's supervisor, and one during the examination of Shoaf. Defendant argues that "[w]hether objected to or not, these five instances or references relating to distributing and selling, when viewed against the entire record, clearly deprived [defendant] of substantial rights."

In the first instance, Wardle was questioned regarding events prior to February 21, 1990, including search warrants and investigations of the Shindig Bar. Defendant objected arguing that such evidence allowed the jury to infer that he was involved in the prior investigations. The objection was overruled.

In the second instance, Wardle was questioned about the difference between dealership quantities and user quantities of drugs. Wardle testified that "[d]ealer quantity would be about an eighth of an ounce or more." The court sustained defendant's objection and instructed the jury to disregard Wardle's response.

During the examination of Wardle's supervisor, Detective James Hronek (Hronek), defendant objected to Hronek's testifying about Wardle's instructions in the undercover investigation, which the trial court overruled. On appeal, defendant cites to Hronek's testimony regarding what quantity he would consider to be a middle–level dealer, however, defendant made no objection to the question or to Hronek's response at the time of trial.

Finally, Shoaf was cross–examined regarding whether she considered Arthur to be a drug dealer. She indicated that he was a dealer of cocaine. Shoaf was then asked in what quantities would Arthur deal, and defendant objected. The court sustained the objection.

In viewing the aforementioned instances, individually and as a whole, we agree with the trial court's overruling of defendant's objections with respect to Wardle's activities and instructions in the undercover investigation. Such evidence was relevant background information regarding the nature and extent of the undercover investigation and the reverse buy operation. Where the jury was instructed to disregard the witness' response, we presume it did. *State v. Melear*, 63 Haw. 488, 497, 630 P.2d 619, 626 (1981) (citations omitted) (presumption that jury adhered to court's admonition to disregard certain evidence). Finally, no evidence of the amount of cocaine that Arthur would deal was ever placed before

the jury, and no evidence was presented which even suggested any connection between defendant and Arthur at any time during the trial.

From our review of the record, we conclude that the conduct of the prosecutor, taken individually and as a whole, did not prejudice any substantial rights of defendant, and in the light of the evidence presented, did not deny defendant a fair trial. *State v. Churchill*, 4 Haw. App. 276, 285, 664 P.2d 757, 764 (1983). We are convinced "beyond a reasonable doubt that the prosecutor's actions had little likelihood of changing the result of the trial." *Id.* at 285–86, 664 P.2d at 764.

## III.

Based on the foregoing, we affirm defendant's conviction.

*Edward K. Harada* (*Linda C. Ramirez* on the brief), Deputy Public Defenders, for defendant–appellant.

*James M. Anderson*, Deputy Prosecuting Attorney, for plaintiff–appellee.