**Electronically Filed
Intermediate Court of Appeals
CAAP-18-0000067
06-APR-2021
07:49 AM
Dkt. 581 SO**

NO. CAAP-18-0000067

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


STATE OF HAWAIʻI, Plaintiff-Appellee, v.
STEVEN CAPOBIANCO, Defendant-Appellant


APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CRIMINAL NO. 2PC161000133)

<u>SUMMARY DISPOSITION ORDER</u>
(By: Leonard, Presiding Judge, Hiraoka and Wadsworth, JJ.)

Defendant-Appellant Steven Capobianco (**Capobianco**)

appeals from the Second Amended Judgment; Conviction and

Sentence; Notice of Entry (**Second Amended Judgment**) entered on

December 7, 2017, in the Circuit Court of the Second Circuit

(**Circuit Court**).[1]  Following a jury trial, Capobianco was found

guilty of one count of Murder in the Second Degree (**Murder**),

stemming from the death of his former girlfriend, Carly "Charli"

Scott (**Scott**), in violation of Hawaii Revised Statutes (**HRS**)

---

[1]      The Honorable Joseph E. Cardoza presided.

§ 707-701.5 (2014),[2] and one count of Arson in the Second Degree (**Arson**) in violation of HRS § 708-8252 (2014).[3]  Capobianco was sentenced to a term of imprisonment for life with the possibility of parole for Murder, and ten years of imprisonment for Arson, consecutive to the term for Murder.

Capobianco raises three points of error on appeal, contending that:  (1) there was insufficient evidence to convict him of the charges; (2) he was deprived of a fair trial due to prosecutorial misconduct; and (3) it was error for the Circuit Court to deny Capobianco's Motion for New Trial based on the break in jury deliberations from December 21, 2016 to December 27, 2016, and alleged juror misconduct.

Upon careful review of the record and the briefs submitted by the parties, and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Capobianco's points of error as follows:

---

[2]     HRS § 707-701.5 provides, in pertinent part:

> **§ 707-701.5  Murder in the second degree.**  (1) Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person[.]

[3]     HRS § 708-8252 provides, in relevant parts:

> **§ 708-8252  Arson in the second degree.**  (1) A person commits the offense of arson in the second degree if the person intentionally or knowingly sets fire to or causes to be burned property and:
>     . . .
>         (b)   Knowingly or recklessly damages the property of another, without the other's consent, in an amount exceeding $1,500.

(1) Capobianco argues that, notwithstanding what he describes as "massive circumstantial evidence," there was insufficient evidence to convict him because the evidence was inadequate to link him to Murder and Arson.

An appellate court reviews the sufficiency of the evidence as follows:

> [E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

State v. Richie, 88 Hawaiʻi 19, 33, 960 P.2d 1227, 1241 (1998) (quoting State v. Quitog, 85 Hawaiʻi 128, 145, 938 P.2d 559, 576 (1997)). "'It matters not if a conviction under the evidence as so considered might be deemed to be against the weight of the evidence so long as there is substantial evidence tending to support the requisite findings for the conviction.'" State v. Ildefonso, 72 Haw. 573, 576-77, 827 P.2d 648, 651 (1992) (quoting State v. Tamura, 63 Haw. 636, 637, 633 P.2d 1115, 1117 (1981)). "'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Richie, 88 Hawaiʻi at 33, 960 P.2d at 1241 (citation omitted).

To support Capobianco's conviction for Murder, the State of Hawaiʻi (**State**) needed to establish that Capobianco

intentionally or knowingly caused Scott's death.  See HRS § 707-701.5.

There was a wide range of evidence adduced at trial, including 75 trial witnesses, and the evidence included, but is not limited to, the following.  Linda Puppollo (**Puppollo**), Clinic Manager for Planned Parenthood of Maui, testified that she met with Scott and Capobianco on October 25, 2013.  Scott was pregnant with Capobianco's child.  Puppollo testified that Capobianco told her that he was not "with" Scott, but he guessed he was the father of the child; she described Scott's reaction as being "in pain" and "definitely feeling bad about it."  As Puppollo was going through all of the options, including alternatives to abortion, Capobianco blurted out, "But we're going to go through with it, aren't we?"  After Capobianco left the room, pursuant to Planned Parenthood protocol, Puppollo asked Scott "if she really wanted to do this," and Scott replied that she was not sure, but would make the appointment for an abortion. Scott never showed up for the appointment, Planned Parenthood telephoned her, and a second appointment was scheduled.  Scott did not show up for the second appointment.  A further call was placed to Scott, but she did not reschedule.

Capobianco's then-girlfriend testified that in January of 2014, Capobianco told her Scott was pregnant.  The girlfriend was upset and did not want to communicate with him for a few days, although Capobianco attempted to make contact with her.

4

When they did speak, Capobianco said he loved her, and she told him she did not want to be a stepmom. Ultimately, she said she would work it out with him. He told her he was not ready to have a child.

One of Scott's half sisters testified that, in December of 2013, when she texted Capobianco after learning about Scott's pregnancy, he called her and said that he had thought Scott had agreed to take care of it. Capobianco said it would ruin plans he had with a current girlfriend.

Scott was last seen by family members on Sunday, February 9, 2014, between 7 p.m. and 8 p.m. Family members testified to growing concerned when she was not in contact with them the next day (Monday, February 10, 2014) as had been expected, and they could not find her or her vehicle; they called the police. One of Scott's sisters testified that on the morning of Tuesday, February 11, 2014, she went to see Capobianco at his job at Mana Foods (**Mana Foods**) to ask if he had seen Scott. Capobianco told her he had last seen Scott on the evening of Sunday, February 9, 2014, when Scott had gone with him toward Hāna to get his vehicle, a white Toyota 4Runner (**White SUV**), which Capobianco said had been broken down there.

Scott's vehicle, a champagne-colored Toyota 4Runner (**Scott's 4Runner**) was found burned and destroyed in an agricultural area at Peʻahi on February 12, 2014. On February 15, 2014, fragmented human remains were found at Nuaʻailua Bay; a

jawbone was later forensically identified as Scott's.  Expert testimony included that Scott's death was most likely a homicide, and the time range for her death was from the night of Sunday, February 9, 2014 into the next morning, Monday, February 10, 2014.  Based on an analysis of collected larvae, or maggots, samples collected from evidence recovered at Nuaʻailua Bay, including Scott's blanket, one of the State's experts testified that it appeared that the remains were obscured for a time, from the night of February 10, 2014, to the morning of February 12, 2014, due to an observed interruption in the larvae activity, which could be consistent with the remains being wrapped in something like Scott's blanket.

During the time that Scott was missing, and after her remains were discovered, Capobianco had multiple discussions with various members of Scott's family, mutual friends, Capobianco's Mana Foods co-workers, as well as separate talks with Maui Police Department (**MPD**) detectives.

MPD Detective Wendell Loo (**Detective Loo**) testified that he was assigned to a missing persons case involving Scott on the morning of February 11, 2014.  Detective Loo spoke with Capobianco by phone on February 11, 2014, and Capobianco voluntarily came in to MPD's Wailuku station and met with Detective Loo and Detective Dennis Lee on the morning of February 12, 2014, for an approximately 35-minute-long interview. Detective Loo had a second interview with Capobianco later on

February 12, 2014, joined at that time by Detective Leif Adachi. On February 28, 2014, Detective Loo, joined by Detective B.J. Gannon, conducted a third interview with Capobianco. All three interviews were recorded. In the police interviews, Capobianco indicated that he had gone to Hāna with Scott on the evening of February 9, 2014, to retrieve his White SUV, which he said had broken down there the night before (February 8, 2014) and had been left on the side of the road.

One of Capobianco's co-workers at Mana Foods testified that she knew Capobianco from work and she knew various vehicles that Capobianco had driven to work. She testified that some time between 9:30 p.m. and 11:30 p.m. on Sunday, February 9, 2014, she saw Capobianco in the area of Hāna driving a different 4Runner, not his White SUV (which was also a 4Runner). She noted it had different "edges," and she thought it looked "silver."

Another expert witness for the State, F.B.I. Special Agent Michael Easter (**Special Agent Easter**), "qualified as an expert in the field of historical cellular telephone site analysis." Special Agent Easter testified that cell phone data showed Capobianco's phone in an area consistent with his Haʻikū residence on the evening of February 8 and early morning of February 9, 2014. The data was consistent with Capobianco being at work at Mana Foods on the morning of February 9, 2014. It showed Capobianco's phone near the Nuaʻailua Bay area on the

night of February 9, 2014, as well as returning to the area multiple times on February 10, 11, and 12, 2014.

According to witness testimony, Capobianco told people that he had left Scott on the road when they were both driving back separately from Hāna, after he retrieved his White SUV. However, trial witnesses contradicted Capobianco's accounts of car trouble that required him to abandon his White SUV by the side of the road near Hāna on the night of February 8, 2014, thus needing Scott's assistance to go back and retrieve it the next night. Special Agent Easter testified that the phone records showed Capobianco was not in eastern Maui before February 9, 2014, but was instead in Haʻikū at his residence, as noted above. A bank's surveillance footage from the morning of February 9, 2014 appeared to show Capobianco driving his White SUV in Pāʻia, on his way to work at Mana Foods, which was also inconsistent with Capobianco's account that he had left the vehicle broken down on the side of the road the previous evening.

Capobianco's statements to witnesses explaining injuries he received near the time of Scott's disappearance were also inconsistent. He told MPD interviewers that his injuries were burns from working as a baker, plus that he was injured working on his truck's window. He told a co-worker that a friend's car window cable wrapped around his hands while he was working on the friend's car. He told another co-worker that a car window fell on his hands while he was working on it with a

friend. Witnesses noted instances in which Capobianco spoke of Scott in the past tense, before her remains were discovered. Evidence was presented that Capobianco tried to dissuade searchers from searching the Nuaʻailua Bay area in the days after Scott's disappearance, claiming that he already searched the area without finding Scott.

When considered in the strongest light for the prosecution, there was evidence of sufficient quality and probative value to enable the jury to conclude that Capobianco intentionally or knowingly caused Scott's death; thus, there was sufficient evidence to convict Capobianco of Murder.

To support a conviction here for the Arson charge, the State needed to prove that Capobianco intentionally or knowingly set fire to or caused Scott's 4Runner to be burned without Scott's consent, and that the damage to the 4Runner was more than $1,500.00. HRS § 708-8252(1)(b). Capobianco makes no separate argument concerning the insufficiency of the evidence supporting his conviction on this charge, instead relying on the general argument that the evidence was inadequate to link the Murder and Arson to him.

The State adduced evidence to establish a time for the burning of Scott's 4Runner from people living near the site where Scott's 4Runner was found in Peʻahi, who smelled smoke in the early morning hours of Monday, February 10, 2014. By Capobianco's own accounts, on the evening of February 9, 2014, he

had left Haʻikū with Scott in Scott's 4Runner to head toward Hāna. His co-worker testified that she saw him in the area of Hāna at sometime between 9:30 p.m. and 11:30 p.m. at night on February 9, 2014, driving a different 4Runner from his own White SUV.

Maui Fire Department (**MFD**) employee James Blando (**Blando**) testified to being a trained MFD fire investigator. He conducted an "origin and cause" investigation on Scott's 4Runner. Blando testified that Scott's 4Runner was burned with an "ignitable liquid" both inside and outside. Blando testified that, based on "burn patterns, intensity burn patterns, more than one fire occurring in the passenger [compartment] and on top of the vehicle, it is my best opinion that this fire was intentionally set."

When all of the evidence is viewed in the light most favorable to the State, there was credible evidence of sufficient quality and probative value to enable the jury to find Capobianco guilty of Arson.

(2) It is undisputed that the State played a portion of audiotape that had been previously ruled to be inadmissible. The portion of the tape that was supposed to have been redacted included a statment by Capobianco to the police that he had slept with one of Scott's sisters after his relations with Scott had ended.

The State had prepared written transcripts of Detective Loo's recorded interview with Capobianco and an audio recording of the interview to play out loud during the detective's examination. It is undisputed that the written transcripts provided to the jury appropriately redacted that portion of the interview in which Capobianco mentioned that he had slept with Scott's sister, in accordance with the Circuit Court's ruling that the statement was inadmissable. The audio that was played in the courtroom, however, included the statement. On the tape, Capobianco had been asked by Detective Loo if he was still in communication with the sister during the time frame preceding Scott's death, and he said no. When asked why not, he said:

> A.  There's a little bit of history there.  And I tried not to talk to [sister] a lot because after I broke up with [Scott], I ended up sleeping with [sister] a couple of times, and it just kind of set the family off.  They didn't like that, obviously.
>
> So I -- me and her kept in communication because we were still friends.  Everything was fine between us, but her family just did not like me, so –
>
> Q.  Okay.  So when was the last time you were intimate with [sister]?
>
> A. Years ago.  It was right --

At that point, the recording was stopped and Capobianco immediately objected and asked to approach the bench. The State promptly agreed and discussed that an earlier redaction was made, but it did not seem that this portion had been redacted. It was confirmed that the improper materials had been properly redacted from the printed copies, but not from the tape. After discussion with counsel, in which defense counsel

emphasized that he did not want the court to repeat or call attention to the particular statement, the Circuit Court said that it would "pick up on a line that's innocuous and tell them everything after that, from that point is stricken. We're not repeating it." The court then noted:

> And I guess to complete the record, what happened here was one -- all of the parties worked on a redaction of something that was in the original transcript that appeared at the end of this recorded statement and at the end of the transcript. It was agreed that that item be redacted. That was done during the last recess.
>
> And so what it appears -- what appears to have occurred is the transcript is correct, but the audio recording itself -- that was -- that was used for the redaction turned out to be not the last version of the redacted statement.
>
> . . .
>
> So this remained. So I understand how this happened, because you folks were scrambling to get this done during the recess.

After the attorneys and the court agreed to strike everything from before the question about the sister, the jury was then instructed:

> THE COURT: Ladies and gentlemen of the jury, we're just about to adjourn, but I -- there's one thing I needed to note for the record and to give you an instruction on.
>
> When you were listening to the recorded statement, I am ordering that after the following question and answer that I'm about to read to you, everything after that that was played is ordered stricken and the -- so the last question and answer that you may consider would be: Question: After the fact? All right. Um, so with [Scott], obviously her family found out, right? Answer: Yeah.
>
> Everything after that that was played, the Court is ordering that it be stricken and not considered by you in any way in your consideration of this case. So please keep that in mind.
>
> And I don't think there's a need to revise the written statement that you were provided as an aid, but we'll double-check that to make sure. And we will have a corrected copy of the recording such that it accurately reflects what you can hear and consider.

> So please keep in mind that instruction. And again, I'll give you an instruction at the end of the case concerning how you're to -- what you're to do with evidence that's stricken. But I've already told you before, evidence that's stricken is not evidence. All right. So please keep that in mind.
>
> Ladies and gentlemen, thank you so much for your cooperation today. Please keep in mind my cautionary instructions. They remain in effect.

Prosecutorial misconduct includes any improper action by a prosecutor, however harmless or unintentional. State v. Maluia, 107 Hawaiʻi 20, 25, 108 P.3d 974, 979 (2005). However, a conviction will not be overturned if the prosecution's misconduct was harmless beyond a reasonable doubt. Id. at 27, 108 P.3d at 981.

> [W]henever a defendant alleges prosecutorial misconduct, this court must decide: (1) whether the conduct was improper; (2) if the conduct was improper, whether the misconduct was harmless beyond a reasonable doubt; and (3) if the misconduct was not harmless, whether the misconduct was so egregious as to bar reprosecution.

Id. at 26, 108 P.3d at 980.

> In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, [an appellate court considers] the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant.

State v. Agrabante, 73 Haw. 179, 198, 830 P.2d 492, 502 (1992).

Here, the State's conduct in playing a portion of the audio recording that was excluded by the court's ruling on a motion *in limine* was improper, and therefore, constituted prosecutorial misconduct. However, as the Circuit Court noted, the inclusion of the omitted portion was simply a mistake in the rushed preparation of the audio recording and printed transcript during a court recess. The court promptly gave a curative

13

instruction that was tailored to specifically address defense counsel's concern that the precluded statement not be repeated. The court's instruction also directed the jury to the written transcript, which did not include the precluded statement. The jury was reminded that stricken evidence is not evidence. Finally, while the evidence against Capobianco was circumstantial evidence, it was extensive and overwhelmingly supported the jury's verdict. Accordingly, we conclude that there is no reasonable possibility that this incident might have contributed to Capobianco's conviction.

Capobianco alleges that there were other incidents of misconduct, including that the prosecution allegedly elicited testimony from witness Adam Gaines (**Gaines**) that Capobianco was a drug dealer. Capobianco cites "ROA Dkt. 205 PDF transcript August 12, 2016 p 3-58" as the place in the record where the alleged misconduct occurred. However, JROA DKT 205 is not a transcript. A review of the transcript from the morning of August 12, 2016 includes some continued direct examination of Gaines by the State, which includes no reference to pot or marijuana, followed by cross-examination of Gaines by Capobianco's attorney. In the cross-examination, Capobianco's attorney asked Gaines about "grow lights" at the house he once shared with Capobianco. Defense counsel asked, for example, "You said that one of the reasons why you were interested in living there was to benefit from the product of those grow lamps,

14

right?"  After Gaines said, "Yeah.  Correct."  Defense counsel asked him what he meant by that, to which Gaines responded that he and Capobianco were partners.  Defense counsel next asked, "So you were a pot dealer, right?"  Gaines responded, "No.  I was a pot grower."  Capobianco points to nothing in the record indicating that the State improperly elicited testimony from Gaines that Capobianco was a drug dealer.  We reject Capobianco's argument that the State committed prosecutorial misconduct by doing so.  We similarly reject Capobianco's vague and unsupported arguments that the State made remarks and misstatements that cumulatively deprived Capobianco of a fair trial.

(3)  Capobianco contends, on two grounds, that he did not receive a fair trial by an impartial jury.

"The United States Constitution and the Hawaiʻi Constitution guarantee the accused in serious criminal cases a fair trial by an impartial jury."  State v. Pitts, 146 Hawaiʻi 120, 129, 456 P.3d 484, 493 (2019) (citation omitted).  "Because the right to an impartial jury in a criminal trial is so fundamental to our entire judicial system, it therefore follows that a criminal defendant is entitled to twelve impartial jurors."  Id. (citations omitted).

> A motion for a new trial based on juror misconduct can be based upon (1) failure of one or more jurors to respond truthfully to questions posed during *voir dire*, or (2) misconduct by one or more jurors during the course of the trial.  In either event, the ultimate inquiry is whether the misconduct deprived the defendant of the fundamental right to a trial by twelve impartial jurors.  If any member or members of the jury was shown not to be impartial, the trial

15

> court's failure to grant a new trial is an abuse of discretion.

State v. Adams, 10 Haw. App. 593, 599, 880 P.2d 226, 231 (1994) (citations omitted).  The Hawaiʻi Supreme Court has further held:

> [W]hen a defendant in a criminal case claims a deprivation of the right to a fair trial by an impartial jury,
>
> > the initial step for the trial court to take . . . is to determine whether the nature of the [alleged deprivation] rises to the level of being substantially prejudicial.  If it does not rise to such a level, the trial court is under no duty to interrogate the jury. . . . And whether it does rise to the level of substantial prejudice . . . is ordinarily a question committed to the trial court's discretion[.]
> >
> > Where the trial court does determine that such [alleged deprivation] is of a nature which could substantially prejudice the defendant's right to a fair trial, a rebuttable presumption of prejudice is raised.  The trial judge is then duty bound to further investigate the totality of circumstances surrounding the [alleged deprivation] to determine its impact on jury impartiality.  The standard to be applied in overcoming such a presumption is that the [alleged deprivation] must be proved harmless beyond a reasonable doubt.

State v. Furutani, 76 Hawaiʻi 172, 180–81, 873 P.2d 51, 59–60 (1994) (citations omitted).

Capobianco first argues that the Circuit Court erred in denying Capobianco's motion for new trial because the jury disobeyed the court's instruction not to discuss the case, and instead, the jury impermissibly engaged in one-on-one telephone communications with each other after hours.

The following summary is not in dispute.  After approximately nine days of deliberations, on December 13, 2016, the Circuit Court received a jury communication that the jury was deadlocked and requesting a time to convene in court to announce that they could not reach a decision (**Deadlock Communication**).

16

About fifteen minutes after the jury was allowed to leave for the day, one of the jurors called the bailiff and stated that she had a concern about the Deadlock Communication. The next day, with the parties present, the court convened and proposed that the juror, with careful instructions not to discuss jury deliberations and other matters related to jury confidentiality, be brought in to court to reveal the nature of the information, with possible follow-up questions by the court and the parties. Upon inquiry, neither party objected.

After being given further individualized instructions on how to proceed, the juror stated that the Deadlock Communication had not been revealed to the jury before the written communication was sent to the Circuit Court. The juror expressed concern that she had not had any input to that communication and felt that other jurors had the same concern. The court asked the juror whether she had discussed the issue with any of the other jurors. The juror said yes, she had called nine of the other jurors and expressed concern about the Deadlock Communication. After the juror left the discussion, defense counsel suggested that the juror's response warranted a jury communication asking the jury if more time would be helpful. The court asked each party whether they would like to first ask that juror or another juror any questions. Both parties said no.

After gathering its thoughts, the Circuit Court proposed a jury communication asking the jury whether further

17

deliberations would assist the jury in reaching a verdict, or whether the jurors were hopelessly deadlocked on both counts and unable to read a verdict. Both parties agreed, the communication was sent, and some time thereafter (the same day), the court received a further communication that the jury had decided to continue to deliberate and that another juror wished to speak with the court. After the parties and the court agreed to proceed in accordance with the same procedure as earlier in the day, the second juror indicated that she was the foreperson and had made a decision to stop deliberations, but after further discussion, the jury decided to continue deliberations and further review the court's instructions. The parties were given an opportunity, but declined, to ask the foreperson any questions. The court proposed that no further instruction be given based on that communication and, upon inquiry, the parties did not object.

The Circuit Court denied Capobianco's post-trial motion for a new trial based upon the above juror misconduct. At the hearing on the motion, the court reviewed the proceedings held on December 14, 2016, and noted that the jury continued its deliberations and reached its verdict on December 28, 2016. Assessing Capobianco's argument of prejudice in light of State v. Chin, 135 Hawaiʻi 437, 353 P.3d 979 (2015), the Circuit Court found and concluded that the general nature of the first juror's communications with the bailiff and the other jurors, which was

only to express concern as to whether the jury was in fact deadlocked, could not have substantially prejudiced Capobianco. The Circuit Court specifically found that there was no indication that any of the improper communications involved the matters subject to the jury's deliberations, and noted that the parties were given an opportunity to question jurors and declined to do so.

In Chin, the supreme court held that, in situations involving communications constituting potential jury misconduct, a trial court should make "(1) an initial determination that the outside influence is of a nature that could substantially prejudice a defendant's right to a fair trial and, once that general nature has been established, (2) an investigation of the totality of the circumstances," in accord with State v. Furutani. Chin, 135 Hawaiʻi at 445, 353 P.3d at 987; see also Furutani, 76 Hawaiʻi at 180-81, 873 P.2d at 59-60. Here, the Circuit Court engaged in the inquiry, as directed by the supreme court. Capobianco then had the initial burden of making a *prima facie* showing that the general nature of the subject conduct could have substantially prejudiced his right to a fair trial. Furutani, 76 Hawaiʻi at 180-81, 873 P.2d at 59-60; Chin, 135 Hawaiʻi at 446, 353 P.3d at 988. We cannot conclude that the Circuit Court clearly erred in determining that Capobianco failed to carry this initial burden. We conclude that the Circuit Court did not abuse

its discretion in denying Capobianco's motion for a new trial based on juror misconduct.

Capobianco also argues that he was prejudiced and deprived of due process by the Circuit Court's break in deliberations from December 21, 2016, to December 27, 2016, and that the Circuit Court abused its discretion in not granting him a new trial on that ground. HRS § 635-32 (2016)[4] grants a trial court discretion to separate a jury during deliberations, and a defendant bears the burden of proving reversible harm as a result of jury separation. See State v. Kanae, 89 Hawaiʻi 198, 202, 970 P.2d 506, 510 (App. 1998). The "separation of a jury *during deliberations* does not constitute prejudicial conduct as a matter of law, 'but is simply a circumstance which, with other circumstances, ought to be taken into account by the court in determining whether or not a new trial should be granted.'" Id. (citing Kealoha v. Tanaka, 45 Haw. 457, 469–70, 370 P.2d 468, 475 (1962)). "Moreover, . . . 'the best reasoned cases have held that there must be some evidence of other misconduct, in addition to the mere fact of separation, which has operated to the party's

---

[4]     HRS § 635-32 provides:

> **HRS § 635-32  Segregation during trial.** It shall not be necessary in any case for any trial jury after having been finally accepted and sworn to try the cause, to be segregated, locked up, or otherwise confined at any time prior to retiring to deliberate upon their verdict; provided that the court may in its discretion order and direct that the trial jury in any case shall be segregated, locked up, or otherwise confined after being finally accepted and sworn to try the cause and until a verdict is arrived at or the jury discharged.

prejudice.'" Id. "In meeting his burden, Defendant must adduce 'some evidence of other misconduct . . . which has operated to the party's prejudice.'" Id.

Here, the Circuit Court explained its factual and legal reasons for denying the motion for new trial based on the jury's separation from December 21, 2016, to December 27, 2016. The court first noted for the record that December 21, 2016, was a Wednesday, while the upcoming Saturday was Christmas Eve, Sunday was Christmas Day, and Monday, December 26, 2016, was a State holiday, and thus the jury would not have been deliberating during half of the recess time period in any event. The court explained that the jury had been involved in this case since the previous May, had been actively deliberating into the week leading to Christmas, and that it was "appropriate to give the jurors some time to enjoy the Christmas holiday with their -- with their families." The court addressed Capobianco's argument that the recess came after the Deadlock Communication, and pointed out that the Deadlock Communication came on December 13, 2016, but the jury had agreed to continue deliberations on December 14, 2016, and had thereafter, for several days, actively deliberated the case with no further indication of being unable to reach a verdict. The Circuit Court considered Capobianco's arguments and the circumstances of this case in light of other cases involving pauses in deliberation, and noted that it had "repeatedly reminded the jurors throughout the entire trial of

the case of the rules related to not reading, watching, or listening to any news accounts.  That had been done many, many times throughout the trial."  The court found that Capobianco had only offered "mere speculation that the jurors might have been somehow exposed to and have actually read news accounts or watched news accounts about the case.  There's absolutely nothing on the record to support that."

Upon review of the entire record in this case, we conclude that the Circuit Court did not abuse its discretion in denying Capobianco a new trial based on this recess in jury deliberations.

For these reasons, the Circuit Court's December 7, 2017 Second Amended Judgment is affirmed.

DATED: Honolulu, Hawaiʻi, April 6, 2021.

On the briefs:

Gerald T. Johnson,
for Defendant-Appellant.

Mark R. Simonds,
Renee Ishikawa Delizo,
Deputy Prosecuting Attorneys,
County of Maui,
for Plaintiff-Appellee.

/s/ Katherine G. Leonard
Presiding Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Clyde J. Wadsworth
Associate Judge