173 P.3d 569

**STATE of Hawaiʻi, Plaintiff–Appellee,**

v.

**Kaleokalani YAMADA, Defendant–Appellant.**

No. 27778.

Intermediate Court of Appeals of Hawaiʻi.

Dec. 6, 2007.

---

Harrison L. Kiehm, on the briefs, for Defendant–Appellant.

James M. Anderson, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

RECKTENWALD, C.J., WATANABE and FOLEY, JJ.

Opinion of the Court by
RECKTENWALD, C.J.

In the early morning hours of February 14, 2003, Nicholas Harukichi Kaneta (Kaneta) and his friend, Quinton Yoza (Yoza), were robbed and severely beaten at the Diamond Head lookout by two male assailants, one of whom wielded a baseball bat. Five weeks later, on March 21, 2003, Defendant–Appellant Kaleokalani Yamada (Yamada or Defendant) was arrested by police at the University of Hawai'i (U.H.) shortly after he and an unknown accomplice used a baseball bat to rob two tourists in the parking lot of the Honolulu Zoo. Police used photographs taken of Yamada after his arrest to assemble a photographic array, which they showed to Kaneta, Yoza, and a witness to the Diamond Head incident, Oliko Kamaola O'Kalani Rory Cookman (Cookman). Yoza and Cookman identified Yamada as one of the perpetrators of that attack.

Yamada was charged with two counts of Robbery in the First Degree, and one count of Assault in the First Degree, in connection with the Diamond Head incident. Prior to trial, the State of Hawai'i (State) moved to introduce evidence of the events of March 21, 2003, including the fact that Yamada had pled guilty to a charge of robbery in connection with that incident. The State argued that this evidence was relevant to establish Yamada's identity as one of the perpetrators of the assault and robbery at Diamond Head. Rather than admit the evidence for that purpose, the Circuit Court of the First Circuit[1] (circuit court) allowed only the introduction of a limited version of the events surrounding Yamada's apprehension at U.H., along with a photograph of a baseball bat recovered from Yamada when he was arrested, for the sole purpose of explaining to the jury how Yamada came to the attention of police and why his photograph was included in the photographic array.

After Yamada was found guilty by a jury, the circuit court granted Yamada's motion for a new trial due to a juror having slept through part of Yamada's closing argument, and noted its " 'serious discomfort' with the deputy prosecuting attorney's use of the bat as evidence establishing Defendant's identity." However, the Hawai'i Supreme Court vacated the order granting a new trial and

---

1. The Honorable Michael A. Town presided.

remanded for sentencing. *State v. Yamada*, 108 Hawai'i 474, 482, 122 P.3d 254, 262 (2005).

Yamada now appeals from the January 25, 2006 Judgment of Conviction and Sentence of the circuit court. Yamada contends that the circuit court abused its discretion by admitting evidence relating to his apprehension at U.H., as well as the photograph of the baseball bat. Yamada also challenges the admission of the photographic array, the sufficiency of the evidence against him, and the conduct of the prosecutor in closing argument. He further seeks reconsideration of the supreme court's decision to vacate the circuit court's grant of a new trial based on the sleeping juror. For the reasons set forth below, we affirm the circuit court's judgment and sentence.

## I. BACKGROUND

### A. Procedural Background

On July 9, 2003, Yamada was charged in a complaint with two counts of Robbery in the First Degree, in violation of Hawaii Revised Statutes (HRS) § 708–840(1)(b)(i) (Supp. 2003) (Counts One and Three),[2] and one count of Assault in the First Degree, in violation of HRS § 707–710 (1993) (Count Two).[3]

On August 19, 2003, the State moved to consolidate this case, Cr. No. 03–1–1509, with a case relating to the subsequent March 21, 2003 incident, Cr. No. 03–1–0840, also involving Yamada. The State's motion stated that in the latter incident, Yamada was "identified as the suspect who threatened [two Japanese tourists,] Kohsuke Shimazaki [ (Shimazaki) ] and Eijiro Watanabe [ (Watanabe) ] when

Defendant used an aluminum baseball bat to smash their rental car and driving [sic] off with the vehicle on March 21, 2003." It went on to state that police recovered two aluminum baseball bats from the stolen car when they arrested Yamada, and as a result of the similarities with this case, Yoza was shown a photographic lineup which included Yamada's photograph. Yoza identified Yamada as one of the perpetrators of the February 14 assault and robbery.[4]

On September 26, 2003, the circuit court denied the State's motion to consolidate the cases, stating in relevant part:

5. Consolidation of the February 14, 2003 and March 21, 2003 incidents may lead the jury to believe the Defendant is a bad person based on one incident and convict on the other incident based on inadmissible character evidence, thereby circumventing the protection of Hawaii Rules of Evidence 404(b).

6. The Defendant's right to testify and remain silent under the United States Constitution and Hawaii State Constitution may also be violated by forcing Defendant to testify or not testify on all counts together.

On November 20, 2003, the State filed its Motion in Limine No. 2 (State's Motion), seeking to introduce evidence of the March 21, 2003 incident. Specifically, the State sought to introduce all or part of the following:

7. That on November 12, 2003, the Defendant pled guilty to the offense of Robbery in the First Degree based on his conduct, to wit, that on Friday, March 21, 2003, at approximately 0215 hours, the De-

---

**2.** At the time Yamada allegedly committed the offenses he was charged with, Hawaii Revised Statutes (HRS) § 708–840 (Supp.2003) stated in relevant part:

> **Robbery in the first degree.** (1) A person commits the offense of robbery in the first degree if, in the course of committing theft:
>
> . . . .
>
> (b) The person is armed with a dangerous instrument and:
> (i) The person uses force against the person of anyone present with intent to overcome that person's physical resistance or physical power of resistance[.]

**3.** HRS § 707–710 (1993) states:

> **Assault in the first degree.** (1) A person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person.
> (2) Assault in the first degree is a class B felony.

**4.** As noted above, police also showed Kaneta and Cookman photographic lineups which included Yamada's photograph. Cookman identified Yamada as one of the perpetrators at Diamond Head lookout. Kaneta was unable to make an identification.

fendant was in possession of a baseball bat at the Honolulu Zoo parking lot and used the bat to smash the body and windows of a car that did not belong to him, while in the company of and acting in concert with a second, unidentified male, while yelling at the two occupants of the car to "Get out" and "Give us money," and thereafter succeeded in stealing the car and the occupants' personal property.

8. That the Honolulu Zoo is approximately one mile from the second [sic] Diamond Head Lookout.

The State argued that this evidence was relevant to show "identity, intent, motive, modus operandi, lack of mistake and plan/preparation[,]" under Hawaii Rules of Evidence (HRE) Rule 404(b), as well as "to meet the prosecution's burden of disproving alibi beyond a reasonable doubt." The State supported this argument by pointing to the similarities of the attacks: the incidents occurred within five weeks of each other, in the early morning hours of a Friday, and were less than one mile apart. Additionally, both involved Yamada and an unknown male accomplice, the use of a baseball bat in commission of the crime, victims who were strangers to the attackers, the element of surprise, yelling, demands for money, and violence by the perpetrators.

That same day, Yamada filed a Motion in Limine (Defense's Motion) asking, *inter alia,* that the court exclude (1) Defendant's guilty plea in the March 21, 2003 robbery, (2) the photographic lineups which included Yamada's photograph taken after he was arrested on March 21, 2003, as well as (3) any irrelevant unfavorable evidence.

On November 21, 2003, Yamada filed his Memorandum in Opposition (Opposition) to State's Motion, arguing that the evidence of the March 21, 2003 incident was inadmissible propensity evidence that was not probative of any fact of consequence to the litigation.

Specifically, Yamada contended that the factual circumstances of the two events differed significantly because they occurred five weeks apart, involved different victims and witnesses, and the manner in which the bat was used in each incident was different. Furthermore, he argued that in the Diamond Head lookout incident, the perpetrator arrived in a car with the license plate covered, whereas in the Zoo incident, the perpetrator didn't have a vehicle and drove away in the victims' car. Finally, Yamada stated that DNA testing of blood found on the baseball bats recovered from the stolen car at U.H. did not match either Yoza or Kaneta, and no connection could be made between these bats and the assault and robbery which occurred at the Diamond Head lookout.

Later that day, the circuit court ruled that it would permit items 1 and 2 from the State's Motion,[5] but only to "provide context, reason, and common sense and concern, how did [police] get this bat and how did [Yamada] come to the attention of authorities[.]" The circuit court withheld ruling on the balance of the items, voicing its concern that the jury might view it as propensity evidence. The court also denied Yamada's motion to suppress the photographic lineup, reasoning that it was admissible to demonstrate the "integrity or the lack of reliability or reliability of the lineup[,]" and that the court would give a limiting instruction to prevent jury speculation.

The following Monday, November 24, 2003, the State filed a Supplemental Declaration Of Counsel in support of its earlier Motion in Limine No. 2. According to the transcripts from that day, the deputy prosecuting attorney (DPA) was notified by the circuit court clerk that the court's November 21 ruling limiting the admissibility of the March 21, 2003 incident had been modified.[6] Additionally, the DPA had spoken twice by phone

---

5. Items Nos. 1 and 2 stated:
   1. That on Friday, March 21, 2003, at approximately 0215 hours, the Defendant was at the Honolulu Zoo parking lot.
   2. That on Friday, March 21, 2003, at approximately 0215 hours, the Defendant was in possession of a baseball bat at the Honolulu Zoo parking lot.

6. According to the transcript, the deputy prosecuting attorney (DPA) understood the court's ruling to be that the court would admit evidence related to the events at U.H., rather than the events that took place at the Honolulu Zoo.

with Albert Teixeira (Teixeira), the U.H. security guard who had apprehended Yamada in the March 21, 2003 incident. The Supplemental Declaration stated that Teixeira related the following during those conversations:

(a) On March 21, 2003 at approximately 2:30 a.m., Albert Teixeira, University of Hawaii [sic] security officer, accompanied by a female security officer, saw two males standing to the rear of a car in a University of Hawaii [sic] dormitory parking lot.

(b) Teixeira saw suspicious activity, that the males appeared to be rifling through clothes within a suitcase in the open hatch at the rear of the automobile.

(c) Teixeira and the other female security officer approached the two males.

(d) Teixeira asked both males for their driver[']s license and identification and neither was able to produce any.

(e) Teixeira then asked the males if they were students and they said, "No."

(f) Teixeira then asked the males what they were doing there, and neither male gave any response.

(g) Teixeira than [sic] asked both males whose car it was and got noncommittal responses from both males.

(h) Teixeira asked the males to produce the car's registration papers.

(i) The male later identified as Kaleokalani Yamada (Yamada) responded that the registration was in the glove box and told Teixeira to go and get it.

(j) Teixeira told Yamada that he cannot do that and told Yamada to go get it.

(k) At this point, Teixeira noticed that the other male had started to shy away from the car.

(l) Yamada, followed closely by Teixeira, walked over to the car's passenger door.

(m) Yamada opened the car's passenger-side front door, bent over and reached into the car.

(n) Teixeira told Declarant that his flashlight was getting weak and he could not see clearly what Yamada was doing inside the car.

(o) Yamada reached down into the passenger footwell area and as he stood up he told his companion, "Run," whereupon the second male fled.

(p) Yamada straightened up and, as he did so, turned around to face Teixeira.

(q) Teixeira noticed that Yamada was now holding an aluminum baseball bat in both hands.

(r) Yamada raised the bat and started to swing the bat at Teixeira.

(s) Teixeira, using both arms in a bear hug, tackled Yamada to the ground.

(t) Teixeira subdued Yamada, handcuffed and detained him until police arrived.

(u) When the police arrived, Teixeira briefed the police on what he had observed and done, whereupon the police then took charge of Yamada.

Before the jury was called in, and prior to opening arguments, the circuit court explained to counsel: "Okay, well, my focus is to alert the jury that [the March 21, 2003 incident] was a separate, unrelated incident [from which] the bat was recovered[,] without getting into any of the so-called bad acts by Mr. Yamada. That is my ruling." Thereafter, the circuit court and counsel reviewed the State's Supplemental Declaration of Counsel, *see supra*, and the court struck items b, d, e, g-k, o, and r-t. Additionally, the court ruled that it would permit the State to introduce a picture of one of the aluminum bats that was recovered.

On November 25, 2003, in light of the court's rulings, and in lieu of having Teixeira testify at trial, the parties stipulated to a slightly revised version of the retained items, as well as the inclusion of a photograph of one of the recovered aluminum bats.[7] At

7. In addition to including a photograph of one of the aluminum baseball bats, the stipulation stated:

1. On March 21, 2003, at approximately 2:30 a.m., Albert Teixeira, a University of Hawaii security officer, accompanied by a female security officer, saw two males standing to the rear of a car in a University of Hawaii dormitory parking lot located at 2579 Dole Street.

2. Teixeira and the other female security officer approached the two males.

that point, Yamada reiterated his objections to any of the evidence coming in:

[DEFENSE COUNSEL]: Your Honor, just also for the record, to be real clear, that this does not impinge or disturb our objections to this whole—

THE COURT: Oh, yes, reserving all of your objections.

[DPA]: And that's a promise that I made to [defense counsel]. So for the record, all objections that the defendant may have to the court's ruling on motion in limine number 2 which was the 404(b) matter, either previously stated or thought of in the future, are preserved. The State has no objection to that.

THE COURT: Very well. You're not waiving anything.

Yamada's trial took place on November 25–26, and December 1–3, 2003. On December 2, 2003, Yamada moved for a mistrial based on statements made by the DPA during closing arguments, in which he highlighted the similarities between the March 21 and February 14 incidents.[8] Outside the presence of the jury, the circuit court ruled as follows:

THE COURT: Let me tell you what the court intended. I think I've been crystal clear. I got after [the DPA] the other day and said I feel like we've been talking past each other and I made it clear again. It came in only—the only relevance was to show the context of how the police got the photograph of—to explain to the jury.

So it wasn't just out of the blue that five weeks later they found—they took Mr. Yamada's photograph. Only to show the taking of the photograph, not as to identity. That was what I thought in my head. That's what I thought I said crystal clear. I re-emphasized it the other day and that's why I got into this limiting instruction. Is that your understanding?

[DEFENSE COUNSEL]: That is my understanding, your Honor.

THE COURT: And now I feel badly I let any of it in at all. I thought it [sic] did it to allow [the DPA] an opportunity to say hey, we only learned about Mr. Yamada five weeks later. That was why I did it, not to show under 404 he was the same fellow that—or was not the—was or wasn't the same fellow up at Diamond Head.

So I want that clear and I'm not blaming you. Maybe I didn't explain it. I clearly had that in my mind. I thought I—remember in chambers I re-emphasized that in front of counsel, maybe not on the record. And then I again today and that's why I wanted that limiting instruction so clear so that's the court's ruling.

[DPA]: If the court had—and I understood. I heard the limiting instruction and I read more into it than was there. If it's only to show where the pictures came from

3. Teixeira asked both males what they were doing there, and neither male gave any response.

4. Upon request, one of the males, later identified as the Defendant Kaleokalani Yamada (Yamada), followed closely by Teixeira, walked over to the car's passenger door to retrieve the car's registration documents.

5. Yamada open the car's passenger-side front door, bent over, and reached into the car.

6. Teixeira's flashlight was getting weak and he could not see clearly what Yamada was doing inside the car.

7. Yamada straightened up and, as he did so, turned around to face Teixeira.

8. Teixeira noticed that Yamada was now holding an aluminum baseball bat in both hands.

9. [9 was struck by agreement]

10. When the police arrived, Teixeira briefed the police on what he had observed and done, whereupon Honolulu police officers then took charge of Yamada and recovered the aluminum baseball bat shown in Exhibit "1", attached hereto.

11. Later on March 21, 2003, the police took the photograph of Yamada that appears as photograph number 3 in the six-person photographic lineup shown by the police to Nicholas Kaneta, Quinton Yoza and Oliko Cookman.

8. During his closing, the DPA used Power Point slides to illustrate his argument. When he began to discuss the similarities of this case to the March 21, 2003 incident for the second time, the circuit court stopped him and instructed the jury to "disregard that particular Power Point[.]" The Power Point slide, presented in bullet point format, stated: "SAME DAY OF THE WEEK: FRIDAY[;] SAME TIME: APPROX. 2:00 AM[;] SAME TYPE OF BAT: ALUMINUM[;] PER YOZA: 'YOUTH TYPE'[;] PER [DETECTIVE] MAKISHIMA: 'BETWEEN TEE-BALL AND LITTLE LEAGUE'[.]"

or how the picture came into the hands of the police, your Honor, does that go to identity?

THE COURT: No.

[DPA]: So that's the part that I completely missed because that was originally why I wanted it in.

THE COURT: I know that and I think that sometimes advocates get their own mind set a certain way. I only wanted to elect—there's going to be a mugshot coming in. Number one, I didn't have to let the mugshot in. I was going to let the mugshot in; therefore, I wanted to show where the mugshot came from, came out of an unrelated incidents [sic] five weeks later at U.H., end of story.

And perhaps in hindsight, [the Defense] shouldn't have let all those different stipulations in about the situation, but he did and I think it explains context. I'm not faulting [the Defense]. It goes only to show how they got the mugshot, not the bat, not the closeness in the vicinity, not the hands on the bat, not the five weeks to the day.

[DPA]: Your Honor, now you're limiting it even more. I thought you indicated that it came in to show how they got the photograph.

THE COURT: Exactly.

[DPA]: And now you just said not the bat.

THE COURT: Not the two hands on the bat. They recovered a bat and as a result, they took his picture. As a result, they showed it to the folks.

[DPA]: It's just—well, your Honor, just based on the stipulation, my understanding was that it was relevant to identity.

THE COURT: I understand.

[DPA]: I apologize to the extent that I am wrong and I violated the court's order. I am apologizing. That is not something that I would do on purpose.

THE COURT: But be that as it may, I just don't want it to happen any more and it puts us all in a tough situation during closing. I thought I made it clear, but be that as it may, we need to go ahead with this. The jury's ready?

[DEFENSE COUNSEL]: Your Honor, on my motion to mistrial.

THE COURT: I'm going to respectfully deny the motion for mistrial. I've given a limiting instruction. I gave what I think was a proper curative instruction during closing and we need to go ahead.

After closing arguments, but prior to the jury stating their verdict, Yamada again moved for a mistrial because (1) some of the jurors appeared to be asleep during closing arguments, and (2) the prosecutor improperly discussed "identity and the zoo incident[.]" Both motions were denied.

The jury found Yamada guilty on all three counts. Before releasing them, the circuit court questioned three jury members about whether they had slept during portions of the trial. In relevant part, one of the jurors admitted to sleeping through up to twenty percent of the Defense's closing arguments.

Yamada moved for a new trial, based on the following grounds:

A. Erroneous rulings on evidence raise "legal cause" for a new trial; and

B. Juror misconduct deprived Kaleokalani Yamada of a Fair Trial; and

C. Deputy Prosecutor's violation of the Court's order regarding State of Hawaii's Motion in Limine No. 2 prejudiced Kaleokalani Yamada's right to a fair trial; and

D. The verdict appears to be so manifestly against the weight of evidence as to indicate bias, prejudice, passion, or misunderstanding of the charge of the court on the part of the jury; and

E. A new trial is required in the interest of justice.

On March 15, 2004, the circuit court granted Defendant's motion "on the sole basis that a juror was asleep for about twenty per cent (20%) of defense counsel's closing argument, that was approximately one hour long, thus the juror was asleep for about twelve (12) minutes."

On April 12, 2004, the State filed a notice of appeal from the circuit court's order. Then, on October 21, 2005, the Hawai'i Supreme Court vacated the circuit court's order

granting a new trial, and remanded the case for sentencing. *Yamada*, 108 Hawai'i at 482, 122 P.3d at 262.

On January 25, 2006, the circuit court entered judgment and sentenced Yamada to two twenty-year terms for Counts One and Three, and a ten-year term for Count Two, all to run concurrently. Additionally, the circuit court ordered Yamada to pay restitution in the amounts of $760.72 for Count One, and $6,981.31 for Count Three.

## B. Factual Background

On the evening of February 13, 2003, Kaneta finished work at around 10:00 p.m. and met up with his friend, Yoza, to rehearse for an upcoming concert. Before practice, the two stopped by a local bar for drinks. Kaneta estimated that he had four beers at the bar, but said that he felt normal at around 11:30 p.m. when they drove to Diamond Head lookout to play. At the lookout, a spot they had frequented for years, the duo sang and played guitar in peace for about an hour and a half. Kaneta remembered the area as being well-lighted, and that there was a "real nice breeze, was open sky, stars, everything."

Before wrapping up, as Kaneta went to his car for a cigarette, a vehicle rapidly pulled up behind his. Still leaning into his car, Kaneta heard Yoza say "oh, oh, oh," and somebody yell "something like [']you talking shit.[']" The last thing he saw as he turned to see the source of the commotion was a blunt object coming toward his face.

The blow from the assailant's baseball bat broke his jaw, lacerated his ear, caused bleeding on the right side of his brain, and knocked him unconscious. When Keneta came to, Yoza told him, "brah, we just got jacked."

Kaneta required surgery on his ear and jaw. After the attack, he suffered from "bad dizzy spells" and panic attacks. Though these episodes subsided, at the time of the trial, Kaneta still periodically experienced them.

Five weeks later, after Yamada was arrested in the March 21, 2003 incident, Kaneta was shown a police photographic lineup, but was unable to identify his attacker.

Kaneta's friend, Yoza, testified next. Yoza recalled that the evening of February 13, 2003 was "a little bit chilly, few clouds in the area. I remember some drizzling later on." He could not remember if the moon was out, but stated that light was reflecting off the ocean from the mansions below, and that there were two street lamps at the lookout.

Yoza testified that on that evening, two people he didn't know pulled up to the lookout in a "white four-door early '80s car" with the headlights off and the license plate covered. Yoza described the ensuing scene:

> [The] [p]assenger jumps out of the vehicle, starts—he appeared to be incredibly angry, started yelling you guys were talking shit, you guys were stalking [sic] shit. I told him I don't know what you're talking about, never seen you before, you know, trying to calm him down. And he proceeded to walk right past me as I was sitting on the wall and swing the bat at [Kaneta].

Before the attacker could strike Kaneta again, Yoza pushed the man against the car and tried to explain that there had been a mistake of identity. At that point, he estimated that their faces were within six inches of each other. After hitting Yoza several times, the man demanded money. Yoza gave him all the cash he had—between five and seven dollars, and pled with his attacker to be left alone. The assailant responded by lifting his shirt and asking, "you want to fucking die tonight?"

Yoza began to fight back. After dodging a wide swing of the bat, he "took [the attacker] to the ground[,]" where the two wrestled before Yoza was able to restrain him. Looking in the direction of the car, Yoza noticed that Kaneta "had moved positions to the— around the trunk area. And the driver [of the white vehicle] was going through [Kaneta's] car[,]" and "touching" Kaneta's person. Later, it was discovered that in addition to the cash taken from Yoza, CDs, Kaneta's wallet and a guitar were missing.

As the assailant struggled to free himself from Yoza, two cars drove up the hill toward the lookout, prompting the driver of the

white car to yell, "We got to go, we got to go." The attacker threw Yoza from his back and jumped into the car as it sped away. Yoza flagged down the approaching cars, one of which pursued the fleeing men. He estimated that the entire event lasted about seven to ten minutes. After calling 911 from a nearby payphone, Yoza smoked half a marijuana cigarette to calm down.

On February 20th, 2003, Yoza met with a Honolulu Police Department (HPD) graphic artist to create a composite sketch of the assailant. On March 21, 2003, Yoza was contacted by police to look at a six-person photographic lineup that they had assembled. He estimated that it took him two seconds to identify Yamada as the person who had attacked him and Kaneta on February 14.

Oliko Kamaola O'Kalani Rory Cookman, the driver who pursued the white car after the attack, testified next. Cookman recounted that he and a friend were driving past the Diamond Head lookout when they noticed Yoza and Kaneta, whom Cookman had met two weeks earlier, rehearsing. The two turned around to go back and listen. Cookman stated that about two minutes elapsed from the time he and his friend passed the lookout to when they returned.

Upon reaching the lookout, Cookman and his friend were stopped by a frantic and bloodied Yoza. Cookman pulled in, shining his headlights on the white car. At that point, Cookman noted, "I got a good look at the passenger."

When the perpetrators fled, Cookman pursued their car, but lost it just past 22nd Avenue when the driver ran a red light. On March 21, 2003, Cookman identified Yamada in a six-person police photographic lineup as the passenger. In his original statement to police, Cookman had indicated that the passenger of the white car had a beanie on. After Cookman had looked at the photographic array and narrowed it down to two, police placed a piece of paper over the mid-foreheads of the men in the photographs. Cookman testified that he recognized Yamada based on his eyes and sideburns. Cookman explained:

[H]e looked at me, he gave me a grin, and then he went back [to the car]. So when he went back, I seen his sideburn, a good look at his—his side here. And his cheeks, kind of round, and his eyes. That's the only way I could get a good identification on this guy.

HPD Officer Patrick Romero (Officer Romero) testified next. Officer Romero stated that he received a call from dispatch about the assault at approximately 1:54 a.m. on February 14, 2003. When he pulled into the lookout at 2:00 a.m., he saw Yoza, Kaneta and their car. At that point, Yoza was "bleeding from the head, and he seemed—he appeared a little woozy." However, Officer Romero stated, Yoza seemed "coherent at the time[.]"

Prior to calling the next witness, the court told counsel:

THE COURT: One of the jurors asked [the clerk]—but she didn't answer this—whether any side views of the defendant were taken, mug shots or pictures. Basically, [the clerk] cut the person off and said that's something—not to go there, I don't need to go there. But I just want to alert—

[DPA]: Yeah, she did alert us, Your Honor.

[DEFENSE COUNSEL]: Likewise, she did alert me.

THE COURT: So I don't know what to do with that, if they have a question of this witness. But I just alert you to that concern. I can shut them down and say you have to rely upon the adversarial process. But you're duly notified as to what I know. Everything I know, I generally communicate to learned counsel.

Thereafter, counsel and the court conducted an off-the-record discussion. When trial resumed, HPD Detective Gordon Makishima (Detective Makishima) took the stand. Detective Makishima confirmed that "Yamada came to the attention of the police involving an incident up on Dole Street behind a UH dormitory[,]" and that "based on that incident," his photograph was taken. The DPA then showed the Detective frontal and side-view photographs of Yamada, which Detective Makishima stated were taken on March 21, 2003.

Over the objection of Yamada, the State moved to admit those photographs into evidence as State's Exhibit 30. At the ensuing bench conference, the DPA argued that the side view was relevant to the testimony of Cookman, who had commented on the length of Yamada's sideburns. The circuit court admitted the photographs "with the understanding and the direction that [the DPA] ask the detective whether he showed [Kaneta, Yoza, or Cookman] the side view[.]".

Subsequently, Detective Makishima explained police procedure for composing photographic arrays and stated that none of the witnesses had seen the profile view of Defendant shown in the State's Exhibit 30. Detective Makishima also testified that the composite sketch in this case was the closest match to a suspect that he had seen in his career.

The State rested, and Yamada moved for a judgment of acquittal, which the court denied.

Yamada's girlfriend, Lindsey Johansen (Johansen), testified first on his behalf. Johansen stated that on February 13, 2003, Yamada came over to her house between 9:30 and 10:00 p.m. According to Johansen, the couple followed their regular routine of getting something to drink and watching T.V. in her room. She maintained that she was able to remember this specific evening because it was the night before Valentine's Day, for which they had made plans together.

Johansen explained that she rents her room and shares the house with a family; however, she did not recall seeing any of the family members that evening or the next morning. The next day, Valentine's Day, Yamada accompanied her to her classes at U.H., and the couple then went to dinner and a movie. Afterwards, Yamada and Johansen met friends in Aiea and returned home between 10:30 and 11:00 p.m.

Johansen stated that she did not contact police or respond to the prosecutor's investigator with information regarding Yamada's alibi because she "didn't know that that's something that happened."

Greg Ho (Ho), the director for the Sack 'n Save store where Yamada was employed at the time of the incident at the lookout, testified that employees were required to be clean-shaven with short hair and sideburns, but could have mustaches. Accordingly, Ho stated, Yamada never had the hair depicted in the police sketch while working for his store.

Yamada testified last. He confirmed Johansen's version of events, and the Defense offered a movie ticket stub from the movie the couple saw on Valentine's Day. Yamada denied having committed the assault and robbery, and stated that he had never met any of the prosecution's witnesses.

## II. ISSUES ON APPEAL

Yamada raises the following points of error on appeal:

1. "The court abused its discretion in allowing the State to present the evidence of the incident at the University of Hawai'i, Mr. Yamada's mug shot in the photographic lineup and the photo of the baseball bat."

2. "There was no substantial evidence to support Mr. Yamada's conviction where the identification evidence was not of sufficient quality or probative value."

3. "The court abused its discretion in denying Mr. Yamada's motion for mistrial where the prosecutor's blatant and intentional violation of the court's order regarding the limited purpose for the evidence of the March 21, 2003 incident constituted prosecutorial misconduct."

4. "Mr. Yamada is entitled to a new trial based on juror misconduct where one of the jurors slept through 20 percent of his closing argument."

## III. DISCUSSION

### A. Introduction of Evidence

We first address Yamada's argument that the circuit court abused its discretion by allowing the State to introduce three "highly prejudicial items to the jury: (1) the evidence that on March 21, 2003 Mr. Yamada had been apprehended at the University of Ha-

wai'i with a baseball bat; (2) the photographic lineup that included a mug shot of Mr. Yamada; and (3) the photograph of the bat that was recovered."

"We apply two different standards of review in addressing evidentiary issues. Evidentiary rulings are reviewed for abuse of discretion, unless application of the rule admits of only one correct result, in which case review is under the right/wrong standard." *State v. Ortiz*, 91 Hawai'i 181, 189, 981 P.2d 1127, 1135 (1999) (internal quotation marks and citations omitted).

"Generally, to constitute an abuse, it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Crisostomo*, 94 Hawai'i 282, 287, 12 P.3d 873, 878 (2000) (internal quotation marks, citations, and brackets omitted).

In order to determine whether the circuit court abused its discretion in admitting this evidence, we must view its rulings in the broader context of the case. The State had sought to introduce evidence of the incident at the Honolulu Zoo in order to establish Yamada's identity as one of the perpetrators of the Diamond Head lookout incident. That evidence would have been highly damaging to Yamada's defense. However, the circuit court declined to admit it, and instead only allowed a much narrower account of the events of that night, as well as the photograph of the baseball bat, for the limited purpose of explaining to the jury how Yamada came to the attention of police and why his photograph was included in the photographic array. Yamada contends that even this limited evidence was highly prejudicial, had little or no legitimate probative value, and served only to improperly suggest that he had a propensity for criminal conduct. In

particular, Yamada challenges the portion of the stipulation which describes him as "holding an aluminum baseball bat in both hands" during his encounter with the security guard at U.H.

We begin our analysis by determining whether evidence of the events at the Honolulu Zoo and U.H. was, as the State argued, admissible for the broader purpose of establishing Yamada's identity as one of the perpetrators of the Diamond Head attack.

### 1. March 21, 2003 Incident

HRE Rule 404(b) (Supp.2006), which closely tracks its federal counterpart, Federal Rules of Evidence (FRE) Rule 404(b),[9] states now, as it did when Yamada was tried:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and. general nature of any such evidence it intends to introduce at trial.

■ This rule prohibits the admission of evidence introduced for the sole purpose of establishing that a party possesses a criminal character and acted in conformity therewith. In the criminal context, HRE Rule 404(b) ensures that "trials focus on the commission of the acts being charged, not on the charac-

---

9. Hawaii Rules of Evidence (HRE) "Rule 404(b) differs from [Federal Rules of Evidence (FRE) Rule] 404(b) in that the latter does not list 'modus operandi.'" Commentary to HRE Rule 404. FRE Rule 404(b) states:

(b) Other Crimes, Wrongs, or Acts.—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other

purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

ter of the accused." Sarah J. Lee, Comment, *The Search for the Truth: Admitting Evidence of Prior Abuse in Cases of Domestic Violence,* 20 U.Haw.L.Rev. 221, 224 (1998).

■ Although such evidence may never be used solely for the purpose of suggesting criminal propensity, under certain circumstances it may be offered to prove other facts of consequence. Such facts include, but are not limited to, "motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident." HRE Rule 404(b); *State v. Clark,* 83 Hawai'i 289, 300, 926 P.2d 194, 205 (1996) ("The list of permissible purposes in Rule 404(b) is not intended to be exhaustive 'for the range of relevancy outside the ban is almost infinite.'") (citing to E.W. Cleary, McCormick on Evidence [hereinafter McCormick] § 190, at 448 (2d ed.1972)).

■ Moreover, HRE Rule 404(b) is an *inclusive* rule, rather than an *exclusive* one:

Rule 404(b) was intended not to define the set of permissible purposes for which bad-acts evidence may be admitted but rather to define the *one impermissible* purpose for such evidence. Only one series of evidential hypotheses is forbidden in criminal cases by Rule 404: a person who commits a crime probably has a defect of character; a person with a defect of character is more likely than people generally to have committed the act in question. In other words, under Rule 404(b), *any* purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character. The Government's right to introduce bad-acts evidence for purposes other than showing a defendant's criminal propensity is by no means unlimited. But the limits derive from the general strictures limiting admissibility such as Rules 402 and 403, not from Rule 404(b).

*Clark,* 83 Hawai'i at 301, 926 P.2d at 206 (brackets, internal quotation marks, and citations omitted, emphasis in original).

10. HRE Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading

■ Accordingly, when evidence is offered for substantive reasons rather than propensity, a trial court must still weigh the potential prejudicial effects of the evidence against its probative value under HRE Rule 403.[10] *See* Commentary to HRE Rule 404 (stating that if offered for "specified purposes other than mere character and propensity ... 'other crimes, wrongs, or acts' evidence may be admissible provided the Rule 403 test is met.").

In *State v. Castro,* 69 Haw. 633, 756 P.2d 1033 (1988), the Hawai'i Supreme Court discussed the dangers of admitting propensity evidence, and stressed the need for courts to apply this balancing test even when evidence is substantively relevant:

The framers of the rule recognized that "[c]haracter evidence is of slight probative value and may be very prejudicial." [HRE Rule] 404 Commentary (quoting [FRE Rule] 404, Advisory Committee's Note). For "[i]t tends to distract the trier of fact from the main question of what actually happened on the particular occasion." *Id.* And "[i]t ... permits the trier ... to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened." *Id.* [HRE Rule] 404(b) thus reiterates the common law rule "that the prosecution may not introduce evidence of other criminal acts of the accused unless the evidence is introduced for some purpose other than to suggest that because the defendant is a person of criminal character, it is more probable that he committed the crime for which he is on trial." E.W. Cleary, McCormick on Evidence § 190 (3d ed.1984) (footnotes omitted); *see, e.g., State v. Apao,* 59 Haw. 625, 638–39, 586 P.2d 250, 259 (1978); *State v. Iaukea,* 56 Haw. 343, 348–54, 537 P.2d 724, 729–32 (1975); *Territory v. Caminos,* 38 Haw. 628, 635–37 (1950).

Yet even when the evidence of other crimes, wrongs or acts tends to establish a

the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

fact of consequence to the determination of the case, the trial court is still obliged to exclude the evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." [HRE Rule] 403. For "the use of the word 'may' in [HRE Rule] 404(b) was 'not intended to confer any arbitrary discretion on the trial judge' but was rather designed to trigger the Rule 403 balance." [HRE Rule] 404(b) Commentary (quoting the House Judiciary Committee Report accompanying the Federal Rules of Evidence).

*Id.* at 643, 756 P.2d at 1041 (some brackets in the original).

Therefore, we must determine (1) if the evidence of the March 21, 2003 incident was probative of any fact of consequence other than character and propensity; and, if so, (2) whether its probative value substantially outweighed the danger of unfair prejudice to Yamada. *See* Addison M. Bowman, HAWAII RULES OF EVIDENCE MANUAL [hereinafter Bowman] § 404–3[1] (3d ed.2006) (citing to *Castro,* 69 Haw. at 644, 756 P.2d at 1041); *see also State v. Renon,* 73 Haw. 23, 32, 828 P.2d 1266, 1270 (1992) ("Thus, in considering the issues on appeal, we must determine 1) whether the evidence of the Mini Park shooting was relevant to the determination of the case, and 2) whether, on balance, its probative value substantially outweighed the danger of unfair prejudice to defendants.").

### a. Evidence of the March 21, 2003 Incident Was Probative of Facts of Consequence

With regard to "identity," Professor Addison M. Bowman has observed:

Identity is always a "fact of consequence" in a criminal case because it characterizes the elemental proposition that the accused (not someone else) committed the crime. That being so, a proponent's assertion that evidence of another crime proves identity is not meaningful unless accompanied by some other theory that heightens probative value and takes the

matter beyond mere propensity. This is because the direct inferential link between prior crime and identity, without an intermediate inference such as motive, plan, or signature, can only be understood in terms of "action in conformity therewith" on the present occasion. In other words, "identity," without more, is likely propensity in sheep's clothing.

Bowman, *supra,* § 404–3[1][D].

■ Consequently, although identity was the sole issue at Yamada's trial and therefore clearly a fact of consequence, we must determine whether there were other "intermediate inferences" that raise the "probative value and take[ ] the matter beyond mere propensity." *Id.*

■ One such "intermediate inference" would be modus operandi. In order for evidence to be probative of modus operandi, "the characteristics and methodology of the [other] crime or act [must be] so strikingly similar to those of the crime or act being litigated as to support the inference that both were the handiwork of the very same person." Commentary to HRE Rule 404. However, "much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive as to be like a signature." *Id.* (quoting MCCORMICK, *supra,* § 190).

■ Framed another way, "[t]he question for the court is whether the characteristics relied on are sufficiently idiosyncratic to permit an inference of pattern for purposes of proof." 2 Jack B. Weinstein & Margaret A. Berger, WEINSTEIN'S FEDERAL EVIDENCE § 404.22[5][c] (2d ed.2007); *cf. United States v. Hudson,* 884 F.2d 1016, 1021 (7th Cir.1989) (similarities between crimes must be "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof"); *State v. Harding,* 141 Ariz. 492, 687 P.2d 1247, 1252– 53 (1984) (despite some differences, a victim's testimony that he was robbed by the defendant about one month prior to the charged murder was admissible due to significant similarities between the incidents); *State v. Harvill,* 15 Ohio App.3d 94, 472 N.E.2d 743, 746 (1984) (evidence of other crime sufficient-

ly similar where "both the victims were weak older men; the attack motive as to each was robbery, and each attack occurred during evening hours; the two attacks were in the same area, within a three-block radius; the two victims were beaten to death, suffering multiple injuries to the head, face, and upper body; both victims suffered inner skull injuries; both victims suffered kicking or stepping injuries; and finally, co-defendants . . . were implicated in each incident."); *State v. Johnson,* 316 N.W.2d 652, 655 (S.D.1982) (upholding the admission of evidence of prior crimes where "[t]he three burglaries occurred within a relatively short time span, the method of committing the offenses was the same in all three cases, and the same type of property was taken as the fruit of all three crimes.").[11]

Here, the March 21, 2003 attack at the Honolulu Zoo and the February 14, 2003 incident at the Diamond Head lookout share strikingly similar characteristics, including: (1) the victims were initially startled by loud, abusive shouting, and then overpowered with sudden violence, (2) the use of an aluminum baseball bat in commission of the crimes, (3) the similar times and close proximity of the offenses, and (4) the participation of two men in the attacks.

Given the analogous styles, which strongly suggest the handiwork of the same actors, we conclude that there is a "direct inferential link," i.e., modus operandi, connecting the Honolulu Zoo parking lot incident with this case. Moreover, any dissimilarities that exist are not significant and do not rise to a level that would "negate the probative value established by the similarities." *Harding,* 687 P.2d at 1252. Therefore, evidence of the Honolulu Zoo incident was relevant under HRE Rule 404(b) for the substantive purposes of establishing modus operandi and identity.

Moreover, had the March 21, 2003 robbery gone to trial, evidence concerning Yamada's subsequent encounter with security guards and police at U.H. would have been relevant.

The circumstances of that encounter—Yamada and another man being observed next to the stolen vehicle, and in possession of an aluminum baseball bat, approximately fifteen minutes after the Honolulu Zoo incident—strongly support the inference that Yamada was the perpetrator of the robbery at the Zoo. *See State v. Hong,* 62 Haw. 83, 86, 611 P.2d 595, 598 (1980) ("Where the corpus delicti has been established, evidence of recent and exclusive possession of the stolen property by the defendant, if unexplained, will sustain a finding of guilt."); *State v. Pickett,* 642 S.W.2d 703, 705 (Mo.App.1982) (holding that evidence that a defendant and his accomplices were in possession of stolen property around the same time and in the general vicinity of the burglary, was sufficient to "give[ ] rise to a permissible inference of guilt and constitute[d] sufficient evidence to submit a case of burglary and stealing to the jury."); *see also United States v. Phelps,* 168 F.3d 1048, 1057–58 (8th Cir.1999) (upholding the admission of evidence relating to defendant's actions immediately before and after the charged shooting, including his arrest, because it did not concern remote or unrelated events, but rather events which were blended with and connected to the charged crime).

Additionally, the fact that Yamada possessed an aluminum baseball bat at U.H. was relevant for another reason: it was probative of his "opportunity" to commit the crime at Diamond Head lookout. HRE Rule 404(b). In *Government of Virgin Islands v. Joseph,* 685 F.2d 857 (3rd Cir.1982), a government witness was permitted to testify about a gun she saw in the defendant's car several months before the crime took place, even though she could not conclusively identify either of the guns recovered by police as the one she had seen. *Id.* at 860. The Third Circuit held that the trial court did not abuse its discretion by admitting the evidence for the purpose of showing opportunity under FRE Rule 404(b), and that in any event, admission of the evidence was "at worst, harmless error." *Id.* at 860–61; *see also*

---

11. Conduct need not be prior in time provided that it is relevant to a fact of consequence in the case. *See United States v. Germosen,* 139 F.3d 120, 128 (2d Cir.1998) ("subsequent act" evidence may be admitted under FRE Rule 404(b)); *see also United States v. Bradshaw,* 690 F.2d 704, 709 (9th Cir.1982) (conduct both before and after charged offense admissible).

*United States v. Robinson*, 560 F.2d 507, 512–14 (2d Cir.1977) (evidence that a defendant was in possession of a .38–caliber revolver at the time of his arrest, ten weeks after the bank robbery for which he was charged, was relevant to prove identity and to show that he had the opportunity to commit the charged offense in which he used the same, or similar looking, gun).

Accordingly, we conclude that evidence regarding the entire March 21, 2003 incident, including Yamada's subsequent apprehension at U.H. and his possession of an aluminum baseball bat at that time, was probative of facts of consequence other than character and propensity, and hence admissible under HRE Rule 404(b).

### b. HRE Rule 403 Balancing Test

▉▉▉▉ Next, we review whether the probative value of the evidence was "substantially outweighed" by the danger of unfair prejudice to Yamada. HRE Rule 403. When weighing probative value versus prejudicial effect in this context, a court must consider a variety of factors, including:

> the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

*Renon*, 73 Haw. at 38, 828 P.2d at 1273.

Applying these principles here, the probative value of the Honolulu Zoo incident and Yamada's subsequent apprehension at U.H. was not substantially outweighed by the risk of unfair prejudice. There was strong evidence that Yamada committed the robbery at the Honolulu Zoo; indeed, Yamada had pleaded guilty to that offense. As we discussed, *supra*, the two incidents occurred only five weeks apart and there were strong similarities between them which made the March 21, 2003 incident highly probative of modus operandi and identity. There was a strong need for the evidence, since Yamada offered an alibi defense, and challenged the

reliability of Yoza's and Cookman's identifications of him. While there was some risk that the jury would be roused to additional hostility against Yamada, we cannot say that such risk "substantially outweighed" the strong probative value of the evidence. Accordingly, we hold that evidence of the events of March 21, 2003 was admissible to provide modus operandi and identity, and that Yamada's possession of a bat was admissible to prove opportunity. *See* Bowman, *supra*, § 404–3[2][B] ("If the defendant presents an alibi defense and disputes his identity as perpetrator, then probative value will consist of high relevance heightened by need for the evidence. Admissibility will almost certainly follow because negative counterweights, whatever their risks, will not 'substantially outweigh' probative value given strong need.").

Rather than admitting evidence of the events at the Honolulu Zoo, which would have been highly damaging to Yamada, the circuit court instead limited the evidence to (1) the parties' stipulation regarding a sharply curtailed version of the events at U.H., and (2) the photograph of one of the baseball bats that had led police to link the two incidents. The circuit court also precluded the State from using that evidence for any purpose other than providing context so as to avoid jury speculation. Finally, the circuit court limited the jury's consideration of the events at U.H. and the bat on several occasions with both oral and written instructions:

> Several times during the trial, I told you that certain evidence was allowed into this trial for a particular and limited purpose. When you consider that evidence, you must limit your consideration to that purpose.

> The court has limited your consideration of the admission of Exhibit 28 (relating to the incident on March 21, 2003 behind the University of Hawaii dormitories), and it is only relevant to show the context in which law enforcement obtained a baseball bat and the photo of the Defendant. There will be no further evidence nor examination on the issue by either party.[12]

12. We note that the circuit court's stated purpose of providing the jury with an explanation of how

In sum, the circuit court made a concerted effort to avoid prejudicing Yamada. It admitted far less damaging evidence than it could have, and for a much narrower purpose. We conclude that the circuit court did not abuse its discretion in admitting this evidence, with one exception. The exception relates to the reference in the parties' stipulation to Yamada "holding an aluminum baseball bat in both hands" after being asked by security officer Texeira to retrieve the car's registration. Although ambiguous, this reference could have been interpreted as suggesting that Yamada intended to assault the officer with the bat. Evidence of this intended assault was of limited probative value, since the circumstances were different from those of the Diamond Head incident, and accordingly, we conclude that the introduction of this evidence was an abuse of discretion under HRE Rule 403. However, because of the ambiguous nature of the reference, the court's oral and written instructions limiting the jury's consideration of the information, and given the strength of the evidence against Yamada, we hold the error to be harmless beyond a reasonable doubt. *See* Hawai'i Rules of Penal Procedure Rule 52(a).

### 2. Photographic Lineup

In *State v. Kutzen,* 1 Haw.App. 406, 620 P.2d 258 (1980), this court adopted a three-part test for the admission of police photographs of a criminal defendant:

1. The Government must have a demonstrable need to introduce the photographs; and

2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and

3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs.

*Id.* at 412–13, 620 P.2d at 262–63 (citing to *United States v. Fosher,* 568 F.2d 207, 214 (1st Cir.1978)); *see also State v. Reiger,* 64 Haw. 510, 512–13, 644 P.2d 959, 962 (1982).

In *Kutzen,* Sears store detectives observed a group of women shoplifting. Although four of the suspects managed to escape, Detective William Gunderson (Detective Gunderson) wrote down their descriptions in his notebook. Roughly ten weeks after the Sears incident, police called in Detective Gunderson to view a photographic array. The five-photograph array consisted of "women who the police believed had engaged in similar illegal activity in the past. Four of the suspects were identified from the [five] photos as the unidentified shoplifters." *Kutzen,* 1 Haw. App. at 408, 620 P.2d at 260. At the subsequent trial, the circuit court admitted two color, double-shot photographic exhibits of Sonya Kutzen (Kutzen) and another defendant, Charlene M. Opunui (Opunui), each consisting of front and profile views with the condition that "(1) all marks identifying them as 'mug shots' be removed and (2) and no reference to their origin or place of viewing be made." *Id.* at 410, 620 P.2d at 261.

On appeal, Appellants challenged (1) the suggestiveness of the pretrial identification, and (2) the admission at trial of the two double-shot photographic exhibits. As to the first issue, this court found the photographic

---

the defendant came to the attention of police has been found to be legitimate in some circumstances. In *United States v. Tibbetts,* 565 F.2d 867 (4th Cir.1977), a defendant was convicted of making a false bomb threat. There was evidence at trial that defendant was under surveillance at the time of the threat. On appeal, the Fourth Circuit upheld the trial court's admission of a recording of an earlier bomb threat, in defendant's voice, made six months earlier. The Court of Appeals concluded that this evidence was relevant "to account for the surveillance and as explanation of how the Government discovered suspects of this type of crime." *Id.* at 868. However, as we discuss in section III.A.2, *infra,* a number of cases have disapproved of refer-

ences to a defendant's prior encounters with police made during the course of testimony about a photographic lineup involving the defendant. Our decision here rests on our conclusion that the challenged evidence would have been admissible to prove modus operandi and identity; thus, we do not decide whether the circuit court's stated rationale for admitting the evidence, standing alone, would have been sufficient. *Cf. State v. Taniguchi,* 72 Haw. 235, 239, 815 P.2d 24, 26 (1991) ("[W]e have consistently held that where the decision below is correct it must be affirmed by the appellate court even though the lower tribunal gave the wrong reason for its action.").

lineup impermissibly suggestive and remanded "for a determination of the question of whether it gave rise to a very substantial likelihood of misidentification." *Id.* at 407, 620 P.2d at 260. With regard to the second alleged error, we held:

Under part one of this test, the government in the present case failed to demonstrate a need to introduce the photographs of Appellants Kutzen and Opunui. They were introduced not to rebut any inferences of unreliability as to [Detective] Gunderson's identification of appellants, but to simply establish his pretrial identification of her [sic] as part of the prosecution's case-in-chief. Indeed, the admission of the photographs into evidence after [Detective] Gunderson made an unequivocal in-court identification of appellants was unnecessary.

Secondly, the appearance of the mug shots themselves inferred that the defendants had prior criminal records. They consisted of combination frontal and profile views of each defendant, with pieces of white paper folded and stapled to mask the identification numbers on their bottom portions. Moreover, a physical examination of the exhibits shows that an inquisitive juror could easily, without removing any staples, have seen the police mug shot identification numbers on the photographs....

Finally, we consider whether the manner of introduction at trial drew particular attention to the source or implications of the photographs. The request by defense counsel to approach the bench after the government requested the admission of the photographs cannot, by itself, be said to have drawn undue attention to them. Nor do we find the court's decision to admit the photographs with the proviso that their identification numbers be further disguised outside the presence of the jury to be improper. The masking itself, however, as we have pointed out, was insufficient so that the manner of the photographs' introduction at trial could have drawn particular attention to their source.

In light of the appearance of the photographs as admitted and the absence of a demonstrable need for their use at trial, we cannot but conclude that the lower court's admission of the photographs was error.

*Id.* at 413, 620 P.2d at 263.

### a. First Prong of the *Kutzen* Test

■ With regard to the first prong of the *Kutzen* test, Yamada concedes, and we agree, that the State had a demonstrable need to introduce the photographic lineup.

In *Reiger*, the Hawai'i Supreme Court upheld the introduction of a police photographic array, stating that because "the defense was alibi[,] [t]he question of identification was ... crucial to the proof of the prosecution's case and obviously, proof that the victim had picked the appellant out of a photographic display at an early point was relevant and necessary to the government's case." *Reiger*, 64 Haw. at 512, 644 P.2d at 962.

As the Maryland Court of Appeals has noted, the "introduction of [a] photo array coupled with testimony about the extrajudicial identification permits the jury to evaluate the fairness of the pretrial identification procedure and to test the veracity of the identifying witness." *Straughn v. State*, 297 Md. 329, 465 A.2d 1166, 1168 (1983) (citing to *United States ex rel. Bleimehl v. Cannon*, 525 F.2d 414, 421 (7th Cir.1975)).

Here, as in *Reiger*, Yamada raised the defense of alibi. Accordingly, evidence that Yoza and Cookman had fairly picked Yamada from the photographic array "was relevant and necessary to the government's case." *Reiger*, 64 Haw. at 512, 644 P.2d at 962.

Yamada, however, maintains that the photographic array fails the second and third prongs of the *Kutzen* test. Specifically, he argues that (1) the photographic array improperly "established" that he had been "arrested by the police for an offense involving an aluminum baseball bat and that the photograph was his mug shot[,]" and (2) "the circumstances of the admission of the photograph obviously drew attention to the source of the photograph as a mug shot." Therefore, Yamada contends that the photograph was more prejudicial than probative.

### b. Second Prong of the *Kutzen* Test

█ In this case, as distinguished from *Kutzen*, the photograph of Yamada that was included in the police lineup was a black-and-white, unmarked, frontal shot. The photographic array was composed of two rows, each consisting of three photographs of young men of similar age and appearance. Above each picture was a handwritten number for the viewer to use when indicating his choice. Finally, at the top of the page were the words "HONOLULU POLICE." Contrary to Yamada's contention that the photographs themselves "established" that he had been "arrested by the police for an offense involving an aluminum baseball bat and that the photograph was his mug shot[,]" there were neither internal police markings, nor mug shot identification numbers on the photos.

Accordingly, we conclude that the photographs, in and of themselves, did not imply that Yamada had a prior criminal record, and do not violate the second prong of the *Kutzen* test. *Kutzen*, 1 Haw.App. at 413, 620 P.2d at 262.

### c. Third Prong of the *Kutzen* Test

█ Turning to the third and final prong of the *Kutzen* test, we look to see whether the manner in which the photographs were introduced drew "particular attention to the source or implications of the photographs." *Id.* at 413, 620 P.2d at 262–63. The circuit court here allowed the admission of evidence regarding how police "took charge" of Yamada after his encounter with Teixeira at U.H., and how police then took the photograph of Yamada that was used in the photographic arrays. In other words, rather than preventing the jury from learning the circumstances under which the photograph was taken, the circuit court provided them a limited version of those circumstances in order to avoid speculation.

The third prong of the *Kutzen* test is designed to prevent the jury from being presented with evidence that the defendant has a propensity for criminal conduct, i.e., that since the defendant had another encounter with police as documented by a mug shot, it is more likely that he committed the crime

for which he is now on trial. It is thus consistent with the general prohibition on the admission of propensity evidence set forth in HRE Rule 404(b).

*Kutzen* and other Hawai'i cases prohibit purely gratuitous references to a defendant's photograph being a "mug shot," since such references amount to no more than the introduction of propensity evidence against the defendant. *See, e.g.*, *State v. Huihui*, 62 Haw. 142, 145, 612 P.2d 115, 117 (1980); *State v. Kahinu*, 53 Haw. 536, 549, 498 P.2d 635, 643 (1972). On the other hand, there is nothing in *Kutzen* or those other cases which suggests that evidence concerning the source of the photograph is inadmissible when it is otherwise relevant, and its probative value is not outweighed by its prejudicial effect. We have already held in section III.A.1., *supra*, that evidence of the March 21, 2003 incident, including Yamada's apprehension at U.H., was admissible to establish Yamada's identity as the perpetrator of the Diamond Head lookout attack. Since that evidence was otherwise admissible, the third prong of *Kutzen* is not implicated here.

### B. Substantial Evidence

█ Yamada next argues that there was insufficient evidence to identify him as the perpetrator of the assault and robbery. Thus, he contends that his convictions on all counts should be reversed. We disagree.

We review the sufficiency of evidence on appeal as follows:

> Evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

*State v. Richie*, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (quoting *State v. Quitog*, 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997)) (brackets omitted).

Here, Yamada argues that the testimony of Yoza and Cookman did not amount to "substantial evidence" because it was inconsistent.

Yamada contends that Yoza's testimony was not credible because he had: (1) been drinking prior to the incident, (2) lied under oath about smoking marijuana before giving his statement to police, (3) been focused on the bat and not the assailant's face, (4) given a description to police that was inconsistent with Yamada's actual appearance, and (5) generally given conflicting testimony about the events of the evening.

Yamada maintains that Cookman (1) falsely claimed to have pulled all the way into the lookout, and did not illuminate the perpetrators with his headlights, (2) initially stated to police that he had seen two or three males get into the car, and (3) gave a vastly different description of the assailant's attire than Yoza.

Finally, Yamada argues that there was a lack of physical evidence to support the State's case.

However, the State presented ample evidence supporting Yamada's guilt. First, both Yoza and Cookman identified Yamada as one of the assailants both in and out of court. Second, police produced a very accurate sketch based on Yoza's description. Indeed, Detective Makishima commented that it was extremely unusual for the sketch to be so accurate. Third, there was ample light for Yoza and Cookman to see Yamada. The moon was nearly full, there were two nearby street lamps, and Cookman testified that he had shined his car's headlights on the assailants.

Finally, Yamada's defense hinged on his alibi that he and his girlfriend had spent the evening together. Yamada's only other witness was his then-employer, who testified that the company policy regarding appearance contradicted the State's witnesses' descriptions of the assailant. The jury, however, believed the testimony of the State's witnesses over that of the Defense's. Therefore,

the verdict represented the jury's determination that Defendant's evidence was not believed, i.e., it did not raise any reasonable doubts of Defendant's guilt and, on the other hand, that the State's witnesses were believed.

. . . .

Thus, on appeal, this court will not attempt to reconcile conflicting evidence, or interfere with a jury decision based on the credibility of witnesses or the weight of the evidence.

State v. Gabrillo, 10 Haw.App. 448, 457, 877 P.2d 891, 895 (1994) (citations, brackets, ellipsis, and internal quotation marks omitted); see also State v. Smith, 106 Hawai'i 365, 372, 105 P.3d 242, 249 (App.2004) ("Sufficient evidence to support a conviction can be established through the testimony of a single witness. It is the province of the jury, not the appellate courts, to determine the credibility of witnesses and the weight of the evidence.") (citations omitted).

Accordingly, we hold that, "considered in the strongest light for the prosecution[,]" there was "substantial evidence" adduced at trial to support the jury's verdict convicting Yamada on all three counts. See Richie, 88 Hawai'i at 33, 960 P.2d at 1241.

## C. Motion For Mistrial

In his third point on appeal, Yamada argues that "the prosecutor's blatant violation of the court's clear and unambiguous ruling on the limited admissibility of the evidence of the March 21, 2003, U.H. incident constituted prosecutorial misconduct that violated Mr. Yamada's right to a fair trial." Thus, Yamada contends that the circuit court abused its discretion when it denied his motion for a mistrial.

■ "Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction." State v. Rogan, 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999) (internal quotation marks and citations omitted).

"In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, we consider the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant." *State v. Agrabante*, 73 Haw. 179, 198, 830 P.2d 492, 502 (1992) (citations omitted).

During the State's closing argument, the following occurred:

[DPA:] All the locations are pretty close. U.H. dormitory, Diamond Head lookout, [Yamada's girlfriend's] house up on Waialae Iki, all within two or three miles of each other.

[DEFENSE COUNSEL]: Objection, your Honor.

THE COURT: Counsel, on Page 23, I have limited the jury's consideration of that stipulation only to show the context of how law enforcement got the bat and the photo so I'm going to have to sustain that objection respectfully.

[DPA]: Your Honor, I'm asking that this stipulation can be used to prove identity.

[DEFENSE COUNSEL]: Objection, your Honor.

THE COURT: I've limited it to show the context and that's been my ruling from the get-go so you need to move along.

The DPA continued, but moments later stated:

[DPA:] And, your Honor, may I argue—you know, I'm not hearing an objection. I'm just going to go ahead and argue that there are similarities between the two [incidents]—

THE COURT: Counsel, I've ruled, I thought, from the beginning of case [sic], that that is irrelevant. It's not to be considered by the jury. It only shows the context on how they got his photograph.

[DPA]: Your Honor, I'll move on.

THE COURT: You need to move on. The jury will disregard that particular Power Point and we'll make that part of the record so that counsel have it later on. Proceed.

After State's closing, and outside the presence of the jury, Yamada moved for a mistrial based on the DPA's statements. The following colloquy ensued:

THE COURT: Let me tell you what the court intended. I think I've been crystal clear. I got after [the DPA] the other day and said I feel like we've been talking past each other and I made it clear again. It came in only—the only relevance was to show the context of how the police got the photograph of—to explain to the jury.

So it wasn't just out of the blue that five weeks later they found—they took Mr. Yamada's photograph. Only to show the taking of the photograph, not as to identity. That was what I thought in my head. That's what I thought I said crystal clear. I re-emphasized it the other day and that's why I got into this limiting instruction. Is that your understanding?

[DEFENSE COUNSEL]: That is my understanding, your Honor.

THE COURT: And now I feel badly I let any of it in at all. I thought it [sic] did it to allow [the DPA] an opportunity to say hey, we only learned about Mr. Yamada five weeks later. That was why I did it, not to show under 404 he was the same fellow that—or was not the—was or wasn't the same fellow up at Diamond Head.

So I want that clear and I'm not blaming you. Maybe I didn't explain it. I clearly had that in my mind. I thought I—remember in chambers I re-emphasized that in front of counsel, maybe not on the record. And then I again today and that's why I wanted that limiting instruction so clear so that's the court's ruling.

[DPA]: If the court had—and I understood. I heard the limiting instruction and I read more into it than was there. If it's only to show where the pictures came from or how the picture came into the hands of the police, your Honor, does that go to identity?

THE COURT: No.

[DPA]: So that's the part that I completely missed because that was originally why I wanted it in.

THE COURT: I know that and I think that sometimes advocates get their own

mind set a certain way. I only wanted to elect—there's going to be a mugshot coming in. Number one, I didn't have to let the mugshot in. I was going to let the mugshot in; therefore, I wanted to show where the mugshot came from, came out of an unrelated incidents [sic] five weeks later at U.H., end of story.

And perhaps in hindsight, [the Defense] shouldn't have let all those different stipulations in about the situation, but he did and I think it explains context. I'm not faulting [the Defense]. It goes only to show how they got the mugshot, not the bat, not the closeness in the vicinity, not the hands on the bat, not the five weeks to the day.

[DPA]: Your Honor, now you're limiting it even more. I thought you indicated that it came in to show how they got the photograph.

THE COURT: Exactly.

[DPA]: And now you just said not the bat.

THE COURT: *Not the two hands on the bat.* They recovered a bat and as a result, they took his picture. As a result, they showed it to the folks.

[DPA]: It's just—well, your Honor, just based on the stipulation, my understanding was that it was relevant to identity.

THE COURT: I understand.

[DPA]: I apologize to the extent that I am wrong and I violated the court's order. I am apologizing. That is not something that I would do on purpose.

THE COURT: But be that as it may, I just don't want it to happen any more and it puts us all in a tough situation during closing. I thought I made it clear, but be that as it may, we need to go ahead with this. The jury's ready?

[DEFENSE COUNSEL]: Your Honor, on my motion to mistrial.

THE COURT: I'm going to respectfully deny the motion for mistrial. I've given a limiting instruction. I gave what I think

was a proper curative instruction during closing and we need to go ahead.
(Emphasis added.)

■ Item number 8 in the Stipulation Regarding Albert Teixeira And Existence of Aluminum Baseball Bat states: "Teixeira noticed that Yamada was now holding an aluminum baseball bat in both hands." The record reflects that this stipulation resulted from the circuit court's refusal to grant the State's request to admit all of its proffered evidence regarding the March 21, 2003 incident under HRE Rule 404(b). Subsequently, the DPA spoke with U.H. security guard Teixeira, and summarized their conversation point-by-point in a Supplemental Declaration of Counsel dated November 24, 2003. *See* section I.A., *supra.* The circuit court then went through the Declaration item-by-item with counsel and eliminated those that it felt strayed too far afield from its purpose of preventing jury speculation. Based on this discussion, the parties entered into the stipulation.

■ We conclude that the prosecutor's conduct, while improper, was unintentional and the result of an ongoing misunderstanding of the court's ruling. Moreover, at the time the comments were made, the circuit court immediately issued a limiting instruction and ordered the jury to disregard the inappropriate comments. Yamada was then given the opportunity to draft a specific limiting instruction and have the statements stricken. However, in order to avoid calling attention to the evidence, he opted not to. Finally, as discussed above, there was ample evidence to support the jury's verdict that Yamada was guilty. *See Agrabante,* 73 Haw. at 198, 830 P.2d at 502.

Accordingly, although the DPA's comments were improper because they exceeded the bounds of the court's rulings, they did not deprive Defendant of his right to a fair trial. Thus, because "[t]he denial of a motion for mistrial is within the sound discretion of the trial court and will not be upset absent a clear abuse of discretion[,]" *State v. Lagat,* 97 Hawai'i 492, 495, 40 P.3d 894, 897 (2002) (citation omitted), we hold that the circuit court did not abuse its discretion in denying Yamada's motion.

### D. New Trial

Finally, Yamada requests that we "re-evaluate[ ]" the Hawai'i Supreme Court's decision in *State v. Yamada*, 108 Hawai'i 474, 122 P.3d 254 (2005). As noted, *supra*, that court vacated the circuit court's decision to grant a new trial and remanded the case for sentencing. Yamada has not presented any circumstances which would justify this court revisiting the supreme court's rulings on this issue, nor do we have the authority to overrule the supreme court. Accordingly, Yamada's final point on appeal is without merit.

### IV. CONCLUSION

In light of the foregoing, we affirm the circuit court's judgment and sentencing.

